John Deere Construction Equipment Company ("Deere") appeals from a judgment entered against it by the Perry Circuit Court. We reverse the trial court's judgment and remand.
 Facts
Earnest England and Johnny England are brothers; together they operate a business known as England Logging. Deere manufactures, among other things, heavy industrial equipment. In the early 1990s, it developed and marketed a line of skidders designated as the E-series. This line included the 548-E model, the 648-E model, and the 748-E model skidder. Shortly after these skidders were placed on the market, Deere learned of various problems with the E-series skidders. Although the problems manifested themselves in various ways, it appeared that the most recurrent problem was in the hydraulic system. However, Deere was uncertain whether the source of the problem was in the design or the components of the skidders. It began reviewing the design and the components of the E-series skidders and began issuing to its authorized dealers service bulletins and newsletters to address the problems.[1]
In 1993, Deere issued an update kit to its authorized dealers in an attempt to deal with the problems that had been identified in the E-series skidders.[2] In 1995, Deere issued another update kit designed to address the overheating of the E-series skidders. Deere denominated this kit as a "fix-as-fail" update, rather than a "mandatory" update.[3]
Warrior Tractor and Equipment Company is a heavy equipment dealer with six retail locations in Alabama. As an authorized Deere dealer, Warrior had entered into a dealership agreement with Deere; that agreement outlined the relationship between Deere and Warrior. Warrior is *Page 175 
also an authorized dealer for numerous other manufacturers of heavy equipment.
In June 1995, the Englands decided to purchase a Deere skidder for use in their logging business.[4] Tommy Moore, a sales representative with Warrior, came to the Englands' job site to show them a used 648-E model Deere skidder Warrior had for sale. Warrior had received this skidder as a trade-in, had performed some repairs on it, and then offered it for sale. According to Earnest England, Moore told them that the 648-E model skidder "was faster, had more endurance, [would] do anything we need done in the woods, and boost our production." Moore left the skidder with the Englands at their job site for three days and, according to the Englands, it performed as Moore had indicated it would.
The Englands decided to purchase the used Deere skidder. The cost of the skidder was $70,000. Warrior provided a 30-day power-train warranty. Earnest England testified that he knew Warrior, not Deere, was providing this warranty, because any warranty provided by Deere on the skidder would have expired by the time the Englands purchased the skidder. He also testified that in negotiating the purchase he met only with representatives of Warrior and negotiated only with Warrior, and that during the negotiations and while the Englands owned the skidder he never contacted Deere for any reason.
Six months after they purchased the skidder, the Englands began experiencing various problems with the skidder. Each time, either the Englands or Warrior's service department was able to fix the skidder; however, problems with the skidder continued to plague the Englands. Finally, in October 1999, while the skidder was at Warrior's service department for repairs, Warrior's service manager asked the Englands if the 1995 update kit had been installed on the skidder. Apparently, it had not. Warrior installed the 1995 update kit that same day. According to Earnest England, the update kit solved the overheating problem but the other problems continued.
The Englands assert that from the time they purchased the skidder they regularly reported to Warrior's service manager that the skidder was overheating. They claim that the service manager never mentioned that the 648-E model skidder's hydraulic system was defective or that an update kit that would correct this problem was available.
According to Warrior's service manager, if the Englands had complained to him that the skidder was overheating, he would have written that complaint on a work order and he would have suggested that the 1995 update kit be installed. The records maintained in Warrior's service department indicate that the Englands first complained of overheating in October 1999. At that time, Warrior's service manager recommended the 1995 update kit to resolve that problem.
On August 3, 2001, over six years after they purchased the skidder from Warrior, Earnest England, individually, Johnny England, individually, and Earnest England and Johnny England d/b/a England Logging sued Deere and Warrior in the Perry Circuit Court. In their complaint, they alleged that Deere (1) fraudulently represented to them that the skidder was free of defects and was suitable for its intended use; (2) fraudulently suppressed material facts regarding the hydraulic system of the skidder; (3) negligently or wantonly failed to complete warranty work, to *Page 176 
service, to maintain, or to repair the skidder; (4) breached implied warranties; (5) breached express warranties; and (6) failed to exercise reasonable and ordinary care in the operation of its business.
Deere and Warrior each moved for a summary judgment as to all claims asserted by the Englands. The trial court initially granted the motions as to both defendants. Subsequently, however, the trial court granted the Englands' motion to alter, amend, or vacate the order as to count II of their complaint, which alleged that Deere and Warrior had fraudulently suppressed material information regarding the defects in the hydraulic system of the skidder.
On September 23, 2002, the Englands' claim of fraudulent suppression against Deere went to trial.[5] The undisputed evidence at trial indicated that the Englands had had no contact with Deere, that the Englands had never attempted to contact Deere regarding problems with the skidder, and that Deere had no knowledge that the Englands had purchased a used 648-E model skidder. It was also undisputed that Deere had repeatedly notified Warrior and its other authorized dealers of problems with the hydraulic system of the 648-E model skidder and had provided the dealers an update kit to address those problems.
The Englands claimed that Warrior did not notify them of the problems with the hydraulic system of the skidder and that Warrior did not notify them of the availability of the 1995 update kit. The Englands sought to impose liability upon Deere for Warrior's alleged failures. At trial, counsel for the Englands stipulated that the Englands' fraudulent-suppression claim against Deere was premised entirely upon their allegation that, in its dealings with the Englands, Warrior was acting as Deere's agent.
At the close of the Englands' case and again at the close of Deere's case, Deere moved for a judgment as matter of law. Deere argued that the Englands had not established sufficient evidence of the existence of an agency relationship between Warrior and Deere and that, therefore, Deere could not be liable for any alleged suppression by Warrior. Deere also argued that the Englands had failed to present any evidence to support their claim for punitive damages. The trial court denied Deere's motion and submitted the fraudulent-suppression claim to the jury.
On September 25, 2002, the jury returned a verdict against Deere, assessing compensatory damages in the amount of $289,000 (consisting of lost profits, repair costs, and damages for emotional distress) and punitive damages in the amount of $1,500,000. On October 7, 2002, the trial court reduced the punitive-damages award, pursuant to § 6-11-21, Ala. Code 1975, to $867,000,[6] resulting in a total award of $1,156,000. The trial court entered a judgment on the verdict as reduced. *Page 177 
Deere filed a motion for a remittitur, a motion for a new trial, and a postverdict motion for a judgment as a matter of law. Those motions were denied by operation of law.
Deere appeals, raising the following issues:
 "I. Whether the trial court erred in overruling Deere's [postverdict] motion for judgment [as a matter of law] as Warrior Tractor and Equipment Company was not an agent of Deere as a matter of law.
 "II. Whether the trial court erred in overruling Deere's [postverdict] motion for new trial and/or judgment [as a matter of law] as Deere had no duty to disclose alleged defects as a matter of law.
 "III. Whether the trial court erred in overruling Deere's Batson [v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),] challenge asserted after voir dire and in its subsequent motion for new trial.
 "IV. Whether the trial court erred in overruling Deere's motion for judgment as a matter of law as the Englands failed to prove by clear and convincing evidence that Deere consciously engaged in oppression, fraud, wantonness or malice.
 "V. Whether the trial court erred in overruling Deere's motion for new trial and/or judgment [as a matter of law] as the Englands failed to provide competent evidence of damages allegedly incurred."
Because of our resolution of issue I, we need not address the remaining issues.
 Discussion
As this Court recognized in City of Birmingham v. Sutherland,834 So.2d 755 (Ala. 2002):
 "Our review of the grant or denial of a motion for a judgment as a matter of law is governed by the following standard:
 "`"The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict [now referred to as preverdict and postverdict motions for a judgment as a matter of law] is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court's ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any evidence most favorably to the non-movant."'"
834 So.2d at 758 (quoting Glenlakes Realty Co. v. Norwood,721 So.2d 174, 177 (Ala. 1998), quoting in turn Bussey v. John DeereCo., 531 So.2d 860, 863 (Ala. 1988) (bracketed language added inGlenlakes Realty)).
We must review the record to determine whether there was sufficient evidence to produce a conflict for a jury to resolve as to whether, in connection with the sale and servicing of the used 648-E model skidder, Warrior was acting as Deere's agent. If the evidence is insufficient to create a jury question on the agency issue, Deere cannot, as a matter of law, be held liable for the acts of Warrior.
Several cases are relevant to the agency issue presented in this appeal. The first of these cases is Malmberg v. AmericanHonda Motor Co., 644 So.2d 888 (Ala. 1994). In that case, Malmberg purchased a used Honda automobile from Tri-States, Inc. Tri-States, an independently owned dealership, was an authorized dealer of Honda products. Tri-States and American Honda had entered into an "Automobile *Page 178 
Dealer Sales and Service Agreement," which outlined the relationship between Tri-States and American Honda. That agreement provided, in substance, that Tri-States was to sell Honda automobiles and to provide warranties on Honda products. The terms of the agreement were as follows:
 "Tri-States [was required] to provide a place of business, including sales, service, and parts departments, according to American Honda's specifications; to keep adequate working capital and net worth; to develop public interest in Honda products; and to keep accurate and current a uniform accounting system in accordance with American Honda requirements. American Honda controlled the advertising by dealers by requiring certain types and kinds of signs, and it authorized the promotion and display of Honda trademarks. American Honda imposed upon its dealers the obligation to `expressly provide to a customer that [an American Honda] warranty goes with' the vehicle."
644 So.2d at 889 (final bracketed language added in Malmberg).
In purchasing the vehicle, Malmberg had contact only with Tri-States; she never met with or talked with anyone from American Honda. However, she believed that she was dealing with "Honda" because she saw brochures, booklets, awards, and plaques relating to Honda products at the Tri-States dealership. When she experienced problems with her used Honda automobile, a dispute arose over the extent of the warranty, if any, that came with the automobile, and she sued both Tri-States and American Honda, alleging fraud. The trial court entered a summary judgment in favor of American Honda, concluding that Tri-States was not the agent of American Honda.
On appeal, this Court addressed the law of agency in some detail, including agency by actual authority and agency by apparent authority. The Malmberg Court stated:
 "Agency is generally a question of fact to be determined by the trier of fact. See Oliver v. Taylor, 394 So.2d 945 (Ala. 1981). When a defendant's liability is to be based on agency, agency may not be presumed; . . . the party asserting agency has the burden of presenting [sufficient] evidence of the alleged agency. Carlton v. Alabama Dairy Queen, Inc., 529 So.2d 921 (Ala. 1988); Wood v. Shell Oil Co., 495 So.2d 1034 (Ala. 1986). The test to be applied in determining whether there existed an agency relationship based on actual authority is whether the alleged principal exercised a right of control over the manner of the alleged agent's performance. Control must be proven; and proof of control requires more than proof of a mere right to determine if the person claimed to be an agent is conforming to the requirements of a contract. Id.
 "The plaintiff presented no evidence that American Honda retained control over the manner in which Tri-States performed in order to meet the requirements of the dealership agreement. Under the dealership agreement, American Honda reserved the right to inspect the Tri-States business operations to determine if Tri-States was conforming to the dealership agreement, but American Honda did not provide day-to-day supervision for Tri-States and did not determine how Tri-States was to comply with the terms of the agreement. Rather, the dealership agreement left Tri-States in charge of determining how to conduct its business in order to comply with the requirements of the agreement.
 "Nevertheless, Malmberg argues that Tri-States could be found to be the *Page 179 
agent of American Honda either through an agency by estoppel or through an apparent agency. The test for determining whether an agency existed by `estoppel' or by `apparent authority' is based upon the potential principal's holding the potential agent out to third parties as having the authority to act. . . .
"`. . . .'
 ". . . The doctrine of apparent authority is based upon the actions of the principal, not those of the agent; it is based upon the principal's holding the agent out to a third party as having the authority upon which he acts, not upon what one thinks an agent's authority might be or what the agent holds out his authority to be. . . .
 "Under the facts of this case, although there was evidence that Honda logos were displayed upon signs, literature, products, brochures, and plaques at the Tri-States place of business, that evidence was `not sufficient, in itself, to create an inference of agency.' Wood v. Shell Oil Co., supra, 495 So.2d at 1039 (emphasis in original)."
Malmberg, 644 So.2d at 890-91. Because the Court found that Malmberg had presented substantial evidence tending to establish that Tri-States was the agent of American Honda with respect to the representations regarding warranties, the Court reversed the summary judgment in favor of American Honda. In other words, because Malmberg sought to impose liability on American Honda based upon Tri-States' alleged misrepresentation regarding the warranty, and because Malmberg presented substantial evidence tending to establish that Tri-States was American Honda's agent for warranty purposes, Malmberg's claim presented a genuine issue of material fact. However, the fact that Tri-States sold Honda's products, maintained a sales and service department, and displayed Honda logos and literature was insufficient, alone, to create an inference of an agency relationship.
In a similar case, McLemore v. Ford Motor Co., 628 So.2d 548
(Ala. 1993), the Alabama Supreme Court upheld a summary judgment in favor of a used-automobile dealer. In doing so, the Court reviewed the relationship between Bill Russell Ford, Inc., an authorized Ford dealer, and Ford Motor Company, the automobile manufacturer. The Court noted that the evidence presented in support of the summary-judgment motion tended to establish that Bill Russell Ford sold used cars of all types, not just Ford cars. Additionally, the sales and service agreement executed by Bill Russell Ford and Ford expressly provided that Bill Russell Ford was not Ford's agent and that Bill Russell Ford exercised sole authority over the day-to-day operations at the dealership. Based on this scant evidence and the lack of evidence showing that Ford exercised any control over the dealership, the Court concluded that the dealership was not the agent of Ford. Therefore, the used-car dealer could not be held liable for Ford's alleged misrepresentation regarding the condition of the used car.
In another case, Goodyear Tire Rubber Co. v. Washington,719 So.2d 774 (Ala. 1998), the Alabama Supreme Court affirmed a judgment entered on a jury's verdict holding Goodyear Tire 
Rubber Company liable for faulty repairs and misrepresentations made by Tire Pro, Inc., an independently owned automobile and tire sale and service center. In Washington, the plaintiff alleged that the manager of Tire Pro told her that Goodyear "stood behind" Tire Pro's service. When Tire Pro performed unauthorized repairs and made what she alleged to be untruthful *Page 180 
statements, she sued both Tire Pro and Goodyear, alleging promissory fraud and willful misrepresentation.
Although the plaintiff in Washington had had no dealings with Goodyear, this Court held that a jury question on the issue of agency was presented based on evidence indicating (1) that Goodyear knowingly allowed and encouraged Tire Pro to use Goodyear signs and to sell Goodyear products; (2) that Goodyear knowingly allowed Tire Pro to represent to customers, through a logo on its invoice, that it was a "Goodyear Certified Auto Service" center; (3) that Goodyear's dealer sales manager testified that Goodyear intended for Tire Pro's customers to believe they were dealing with a Goodyear establishment; (4) that the tires sold to Washington's daughter were "Goodyear Eagles"; and (5) that the repairs performed on Washington's daughter's car were performed by Tire Pro as a "Goodyear Certified Auto Service" center. Relying upon Malmberg, supra, the Washington Court found that a jury question was presented as to whether an agency relationship existed between Goodyear and Tire Pro.
Finally, in Wood v. Shell Oil Co., 495 So.2d 1034 (Ala. 1986), a customer who was injured when he slipped and fell at Parker Shell, an independently owned gasoline service station, attempted to hold Shell Oil Company, the supplier of petroleum products to the gasoline station, liable for those injuries under a theory of vicarious liability. The trial court entered a summary judgment in favor of Shell Oil, and the customer appealed.
On appeal, this Court found the evidence of an agency relationship between Shell Oil and Parker Shell insufficient to submit the customer's claims against Shell Oil to a jury. TheShell Oil Court stated:
 "We are of the opinion that Wood has produced no evidence that Shell Oil retained any right of control over the manner in which Parker Shell performed in order to meet the requirements of the lease and dealer agreement. Although the lease and dealer agreement specify, in some detail, what Parker Shell must do in order to conform to the terms of these contracts, and gives Shell Oil a right to approve certain aspects of Parker Shell's operation, they do not determine how Parker Shell is to achieve compliance with these terms. Of course, a contract which, on its face, directly disclaims any agency relationship or which does not by its terms create such a relationship, will not preclude the finding of agency if there is independent evidence of a retained right of [c]ontrol. However, Wood has not provided any independent evidence regarding the relationship between Shell Oil and Parker Shell from which a jury could infer an agency relationship. Shell Oil's motion for summary judgment on the issue of actual authority was properly granted."
495 So.2d at 1037 (citations omitted).
In addition, the Shell Oil Court rejected Wood's theory of liability based on a theory of apparent authority or agency by estoppel. Wood argued that the display of Shell Oil's logo on the premises of Parker Shell and on the uniforms of its employees provided the then applicable scintilla of evidence necessary to support the inference that Parker Shell was the apparent agent of Shell Oil.
The Shell Oil Court stated:
 "We are of the opinion that Wood has failed to prove any reliance upon the authority of Parker Shell that would make out a jury question on the issue of apparent authority or agency by estoppel. Wood has not provided any evidence that he did business with Parker Shell because of a desire to do business with a more responsible party (i.e., Shell *Page 181 
Oil). Wood had no Shell credit card, nor is there any other evidence that might indicate that Wood's reliance on Parker Shell was in any way attributable to his confidence in Shell Oil. Additionally, there is no evidence, such as that in [Standard Oil Co. v.] Gentry, [241 Ala. 62, 1 So.2d 29 (1941),] that the plaintiff had relied on a continued operation of the service station by the lessor oil company following a change in operation of the station from the oil company to the lessee. Moreover, the vast majority of the courts have held that the fact that the plaintiff testifies that the lessor oil company's distinctive logo displayed upon signs, literature, products, and employee uniforms led him or her to assume that it was operated by the oil company is not sufficient, in itself, to create an inference of agency, because it is common knowledge among the general public that such a logo is often displayed by independent dealers and that the only representation made by such displays is that the oil company's gasoline is sold at the service station."
495 So.2d at 1039. See also Williams v. Harold L. MartinDistrib. Co., 769 So.2d 305 (Ala.Civ.App. 1999), rev'd on othergrounds, 769 So.2d 313 (Ala. 2000); Ison Logging, L.L.C. v.John Deere Constr. Equip. Co., N. CA99-979-C (S.D.Ala., Oct. 12, 2000) (unpublished).
Warrior and Deere entered into a dealership agreement; that agreement was submitted as an exhibit at trial. Under the agreement, Warrior agreed to sell and promote new Deere products, maintain a certain amount of net worth so as to be properly financed, and maintain a modern, suitable place of business with adequate space and facilities for sales, service, display, and storage of Deere products. Warrior agreed to provide competent management and staff who were adequately trained and agreed to send its personnel to conferences and training schools provided by Deere. Warrior also agreed to provide service equipment and to maintain an adequate stock of service parts and the appropriate tools necessary to fulfill the warranty obligations of Deere and the nonwarranty needs of Warrior's customers who purchased Deere products.
Under the terms of the agreement, Warrior also agreed to maintain an inventory of goods in proportion to its area of responsibility. Warrior agreed that it would cooperate with Deere in Deere's periodic reviews of Warrior's performance to determine if Warrior was performing in accordance with the terms of the dealer agreement.
The agreement also specifically stated:
 "[Warrior] is not an employee, agent or representative of [Deere] for any purpose other than giving the Company's warranty as provided in Section 8 [Preparation of Goods, Warranty and Post Delivery Service]; [it] has no other authority to bind [Deere] by any representations, statements, agreements, or in any manner whatsoever. In performing service work as provided in Section 8, [Warrior] is an independent contractor and assumes full responsibility for such work."
Additionally, Gene Taylor, the owner of Warrior, testified that Deere does not direct the actual day-to-day operations at Warrior.
As a matter of law, this evidence is insufficient to create a jury question on the issue of actual agency. Although the dealer agreement gave Deere the right to conduct periodic reviews of Warrior's performance, that agreement neither gave Deere the right to control Warrior's day-to-day activities nor gave Deere any authority to dictate how Warrior fulfilled its requirements under the agreement. Taylor, *Page 182 
the owner of Warrior, confirmed that Deere does not exercise any day-to-day authority over Warrior's business operations. Thus, there was no evidence presented to support a finding of actual agency.
Neither was there evidence that presented a jury question on the issue of apparent agency or agency by estoppel. There was no testimony indicating that the Englands ever spoke with or dealt with a representative of Deere; there was no testimony that the Englands ever believed they were dealing with a representative of Deere or that they ever thought they had obtained a warranty from Deere. Both Earnest England and Johnny England understood that they were purchasing a used skidder, that it had only a 30-day power-train warranty, and that Warrior — not Deere — was providing that warranty. There is not even an allegation that the Englands or Warrior referred to Deere during the entire six-year period the Englands owned the 648-E model skidder. Thus, the only evidence related to the issue of apparent agency or agency by estoppel is the fact that at its place of business Warrior displayed Deere's logos, signs, and literature. However, this Court has already rejected such evidence, standing alone, as creating any inference of an agency relationship. See Wood v.Shell Oil Co., supra.
 Conclusion
The trial court erred in denying Deere's postverdict motion for a judgment as a matter of law on the issue of agency. Without conflicting evidence for the jury on the issue whether an agency relationship existed between Deere and Warrior, there can be no liability on Deere's part for Warrior's allegedly fraudulent suppression. We reverse the judgment entered against Deere on the jury's verdict and remand this cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, BROWN, and WOODALL, JJ., concur.
LYONS, JOHNSTONE, and HARWOOD, JJ., dissent.
[1] According to testimony presented at the trial, technical problems with new equipment lines are not uncommon. Deere often issues service bulletins and newsletters to its dealers to address design or component problems or equipment malfunctions that have been identified.
[2] The 1993 update kit replaced the skidder's relief valve and nose seals and added a red indicator light to alert the operator if the skidder was overheating.
[3] In addition to correcting the problem with the hydraulic system of the skidder, this 1995 update kit also upgraded the E-series skidder so that it was comparable to the later G-series skidder manufactured by Deere.
[4] Earnest England testified that the Englands had previously used other manufacturers' skidders in the logging business and wanted to try a Deere skidder.
[5] Immediately before trial, the Englands entered into a settlement agreement with Warrior, agreeing to dismiss their pending fraudulent-suppression claim against Warrior in exchange for $50,000. Therefore, Warrior was not a party to this action at the time of trial.
[6] This amount is three times the amount awarded as compensatory damages. Section 6-11-21(a), Ala. Code 1975, provides, in pertinent part:
 "[I]n all civil actions where an entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), whichever is greater."