[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 229 
Wesley J. Brown, a minor proceeding by and through his mother and next friend, Stephenie L. Brown, in a medical-malpractice action, appeals from a summary judgment entered in favor of one of the defendants, St. Vincent's Hospital. We affirm.
The action was originally brought solely in Ms. Brown's name against Cynthia H. Brown, M.D. ("Dr. Brown"), Sparks Favor, P.C. (the obstetrical and gynecological group with which Dr. Brown practiced), and St. Vincent's. Through the process of various amendments and stipulations, however, Wesley became the sole plaintiff, asserting, as against St. Vincent's, only the claim that it should be held derivatively *Page 230 
liable for the negligence and wantonness he alleged against Dr. Brown. Specifically, he alleged that Dr. Brown was acting "under the apparent authority of" St. Vincent's and that St. Vincent's "held itself out as having a labor and delivery unit for the birthing needs of mothers and their babies and at all relevant times was a healthcare provider that held itself out as providing competent obstetrical care." (Count one of the amended complaint.) The claims against Dr. Brown and Sparks and Favor remain pending, and they are not parties to this appeal.
Wesley alleges that his mother was an obstetrical patient of Dr. Brown's; that Dr. Brown undertook to manage his mother's labor and delivery, as the result of which Wesley was born at St. Vincent's on May 12, 2000; and that Dr. Brown was "guilty of [certain] negligent acts and/or omissions" before and during the delivery, leading to the development of a condition known as "shoulder dystocia" and resulting in permanent nerve damage to Wesley.
After the case had been pending for 10 months and various depositions and other discovery had been completed, St. Vincent's moved for a summary judgment in its favor. In its motion it pointed out, among other things, that Wesley conceded that Dr. Brown was not an actual employee or agent of St. Vincent's and that the facts were such that it was undisputed that Dr. Brown was not "an apparent agent, servant or employee of St. Vincent's." St. Vincent's argued that "the test to be applied is whether the potential principal held the potential agent out to third persons as having the authority to act" and asserted that Ms. Brown could not establish that she had relied on any "holding out" of Dr. Brown by St. Vincent's, particularly in light of the fact that she had signed a consent-for-treatment form upon her admission at the hospital on May 12, 2000, which explained that her doctor and all other doctors providing care to her while she was in the hospital were not the agents, servants, or employees of St. Vincent's but were independent practitioners. In his response to the motion for a summary judgment, Wesley acknowledged that his theory of liability against St. Vincent's was "based upon apparent or implied agency," which issue he stated had been "fully briefed in connection with [his] mother's case before it was voluntarily dismissed." Wesley elaborated:
 "[Wesley] asserts two separate bases for establishing the agency relationship between the hospital and Dr. Brown. The first is `apparent authority.' The second basis is `agency by estoppel.' The main difference between the two is that apparent authority does not require any detrimental reliance by the plaintiff.
 "The apparent authority theory is based on Section 429 of the Restatement (Second) of Torts (1965), which provides:
 "`One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.'
". . . .
 "The agency by estoppel theory is based upon Restatement (Second) of Agency § 267 (1958). Section 267 provides:
 "`One who represents that another is his servant or agent and thereby causes a third person to justifiably rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.'"
Wesley acknowledged to the court that "[n]either of theseRestatement sections have been at issue in an Alabama case," but stated that "there is every reason to believe, from a judicial perspective, that the Alabama Supreme Court would apply *Page 231 
these agency theories in a medical malpractice case."
Wesley argued that there were disputed facts concerning whether Dr. Brown was the apparent agent of St. Vincent's, asserting that "[t]he disputed facts are set forth in the affidavit of Stephenie Brown," which he attached as an exhibit to the response. That affidavit, in turn, reads in its entirety as follows:
 "1. I, Stephenie Brown, . . . had my baby Wesley Brown delivered at St. Vincent's Hospital on May 12, 2000, by Cynthia H. Brown, M.D.
 "2. Wesley was my fifth child. All my other children were delivered by Greg Banks, M.D., at Brookwood Hospital in Birmingham, AL.
 "3. During my pregnancy I saw a television advertisement by St. Vincent's Hospital that concerned the delivery of obstetrical services in birthing suites at its relatively new Women's and Children's Center. This advertisement led me to believe that the hospital was holding itself out as a hospital that had good obstetricians who provided quality obstetrical services in luxurious birthing suites.
 "4. Upon seeing the advertisement, some time in late 1999, I called St. Vincent's Hospital in Birmingham, Alabama, to see if they had any obstetricians who were taking on new patients. I asked the representative of St. Vincent's about this and then I was put on hold. I was then transferred to another person who took my name and number and told me that they would have to call me back with information on an obstetrician. A representative of St. Vincent's then called me at home and gave me Dr. Brown's name, my appointment time, and directed me to Dr. Brown's office in the St. Vincent's professional office building. I was directed to Dr. Brown as an obstetrician from St. Vincent's who was taking on new patients and I was not given a choice of physicians by the St. Vincent's representative.
 "5. I first went to see Dr. Brown at the St. Vincent's office building in December 1999. I thought Dr. Brown worked for St. Vincent's.
 "6. I relied upon the television advertising (and the statements of the St. Vincent's representatives) in obtaining the obstetrician that the hospital provided to me and I looked to the hospital for providing these obstetrical services for me and my baby. In fact, I continued to see this advertising during my pregnancy and was reassured about the quality of the obstetrical services that St. Vincent's hospital said it provided to expectant mothers.
 "7. I never saw any signs at either the St. Vincent's Hospital's professional office building or the birthing suite at St. Vincent's Hospital that suggested in any way that Dr. Brown was not an agent or employee of St. Vincent's Hospital.
 "8. I was originally scheduled to be induced on May 11, 2000, and then got a call from the hospital wanting to know if I could come in the next day because all their obstetrical beds were going to be full on May 11th. The representative of St. Vincent's Hospital told me that its obstetrician, Dr. Brown, could induce me on May 12th so I agreed to that date.
 "9. I do not recall signing any consent to treatment forms although I am sure that I did consent to treatment on May 12, 2000. When I got into the birthing suit the nurse asked me to undress and get into a gown. I was also asked to take out my contact lenses. After I had undressed the nurse told me that there were some consent forms that I needed to sign. The nurse held the consent forms on a clip board and briefly told me *Page 232 
what each form was for and asked me to sign them. The nurse told me that this paperwork was just something that could be gone over very briefly and that the hospital has everybody sign the paperwork and it was no big deal. She definitely did not read the consent forms entirely. At no time did anyone ever go over the paperwork with me. I could not read the consent forms myself because my contacts were taken out. Because I had been told to make my contacts out, I could not see where I was supposed to sign the form. In fact on one form I signed my name in the wrong place and it had to be crossed out.
 "10. I am sure that no one ever asked me to acknowledge that Dr. Brown was not an employee or agent of the hospital. If I signed such a form it is because I believed I was consenting to treatment and I surely did not mean to be acknowledging some legal relationship between Dr. Brown and the hospital. From the time that I first saw the advertisement until Wesley was delivered, no one told me that Dr. Brown was not an employee of the hospital.
 "11. Had I known that Dr. Brown was not an employee of St. Vincent's Hospital, I would have had Dr. Banks deliver my fifth baby. I went to the physician St. Vincent's directed me to because of the way that St. Vincent's Hospital held itself out in its advertising.
 "12. At all times I have believed that Dr. Brown was an employee, agent, and representative of St. Vincent's Hospital who worked for St. Vincent's. When the hospital called me back for the appointment with Dr. Brown they did not give me a choice of another obstetrician. When I told the representative of St. Vincent's that I had seen their advertisement for the obstetrical services and was pregnant, I simply wanted them to provide me with obstetrical services and an obstetrician who was taking on new patients."
On March 24, 2003, three days after St. Vincent's had filed its motion for a summary judgment, Wesley filed a motion with the court asking that it reconsider the publication time frame for the advertising it had earlier required St. Vincent's to produce in response to discovery requests. Specifically, Wesley stated in his motion that "[t]his Court previously indicated that it would limit discovery on agency to essentially only advertising seen by Ms. Brown," but that, under the approach taken in other jurisdictions, "[a]ny advertising which shows that the hospital held itself out as providing medical services is relevant to how the hospital represented itself, regardless of whether the plaintiff saw each specific advertisement." Wesley asked that the trial court require production of all advertising "for the period September 1, 1996, until May 13, 2000." Apparently, although not entirely clear from the record, the trial judge had ordered St. Vincent's to produce advertising for the period August 1, 1999, to December 31, 1999, presumably based on the facts that Ms. Brown became pregnant in August and that she selected Dr. Brown as her obstetrician on December 20, 1999. St. Vincent's produced certain materials for that time frame but asserted that no advertising for its Women's and Children's Center had been aired on television between August 1, 1999, and December 31, 1999.
In June 2003, Wesley was allowed to file with the court a videotape containing "three video clips" he had obtained under subpoena from Intermark Group, Inc., the advertising agency for St. Vincent's. He asserted that St. Vincent's had produced during discovery only one of the video clips and that Amber Ryan, a representative of *Page 233 
Intermark, had told a representative of Wesley's attorney that it was "likely" that all three video clips had been published during the period October 1999 to December 1999. Wesley's showing in this regard included a copy of the subpoena he had served on Ms. Ryan, requesting the production of all advertising "for the period August 1, 1999, until May 13, 2000." (Emphasis supplied.)
Ms. Ryan subsequently filed an affidavit with the court in which she explained that in response to an initial inquiry from the office of Wesley's counsel concerning advertising by St. Vincent's during the period August 1, 1999 to December 31, 1999, she had told the representative making the inquiry that she had already given that information to St. Vincent's. Subsequently, when the document-production subpoena expanding the time frame was served upon her, Ms. Ryan located the two additional video clips and
 "determined that at least one of those ran during January, April, and May of 2000. I could not determine which of the two had actually been aired. There is nothing in the records of Intermark Group which would indicate that any Women's and Children's Center television ads ran in August, September, October, November, or December of 1999."
She concluded her affidavit by stating that she had not told Wesley's counsel that she believed that the two additional video clips she located "were likely `published' or aired during October, November, and/or December of 1999, as [she had] absolutely no reason to think that is true."
The record reflects that the trial court set the summary-judgment motion for hearing on May 1, 2003, and that on July 11, 2003, it entered a summary judgment in favor of St. Vincent's. The judgment was certified as "final" pursuant to Rule 54(b), Ala. R. Civ. P.
 "`In reviewing the disposition of a motion for summary judgment, we utilize the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact' and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)."
Ex parte General Motors Corp., 769 So.2d 903, 906 (Ala. 1999).
 "When the basis of a summary-judgment motion is a failure of the nonmovant's evidence, the movant's burden, however, is limited to informing the court of the basis of its motion — that is, the moving party must indicate where the nonmoving party's case suffers an evidentiary failure. See General Motors, 769 So.2d at 909 (adopting Justice Houston's special concurrence in Berner v. Caldwell, 543 So.2d 686, 691 (Ala. 1989), in which he discussed the burden shift attendant to summary-judgment motions); and Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (stating that `a party seeking summary judgment always bears the initial responsibility of informing the [trial] court of the basis of its motion')." *Page 234 
Rector v. Better Houses, Inc., 820 So.2d 75, 80 (Ala. 2001).
 "When the trial court does not give specific reasons for entering a summary judgment, we will affirm the judgment if there is any ground upon which the judgment could have been based. Yarbrough v. C S Family Credit, Inc., 595 So.2d 880, 881 (Ala. 1992)."
McCloud v. City of Irondale, 622 So.2d 1272, 1273 (Ala. 1993).
Wesley does not argue in his briefs to this Court that St. Vincent's did not satisfy its Rule 56, Ala. R. Civ. P., burden of production by informing the trial court of the basis for its motion, i.e., that St. Vincent's did not indicate "where the nonmoving party's case suffers an evidentiary failure." Rector,820 So.2d at 80. Rather, Wesley argues only that "[a]ll the [nonmovant] is required to show is that substantial evidence creates a genuine issue of material fact" (Wesley's brief, p. 6); that "[q]uestions of apparent agency are questions of fact and therefore for the jury to determine" (Wesley's brief, p. 7); and that "[a] factual issue exists on the plaintiff's separate claims of apparent agency and agency by estoppel" by virtue of his mother's affidavit. (Wesley's reply brief, p. 3.) As a collateral matter, Wesley argues that "the trial court prevented [him] from presenting a complete apparent authority case when it failed to order discovery of [St. Vincent's] advertising prior to Ms. Brown's pregnancy. This information may show how [St. Vincent's] held itself out as employing obstetricians."
In his principal brief to this Court, Wesley argues, as he did before the trial court, that St. Vincent's "can be held vicariously liable under the guiding principle of apparent authority based upon Section 429 of the Restatement (Second) ofTorts (1965)" and the principle of agency by estoppel, which "is based upon Restatement (Second) of Agency § 267 (1958)." Wesley cites and discusses various decisions from other jurisdictions in support of his argument that his claim against St. Vincent's should be allowed to go forward under the liability concepts expressed by the sections of the Restatements he cites, but he cites no decisions from either this Court or the Court of Civil Appeals in this section of his principal brief. In the corresponding section of his reply brief, he cites John DeereConstruction Equipment Co. v. England, 883 So.2d 173 (Ala. 2003), but without discussing its holding other than to state that "[u]nder the analysis recently used by this Court in JohnDeere, the plaintiff has presented a factual issue on agency" (Wesley's reply brief, p. 4); he also cites Malmberg v. AmericanHonda Motor Co., 644 So.2d 888 (Ala. 1994), but only as support for his statement that "[t]his Court applies apparent agency to the manufacturer-dealer relationship."
Arguably, by eschewing any consideration of Alabama law on point in his principal brief, and relying exclusively on foreign caselaw and the two sections from the two Restatements, Wesley has "put all his eggs in one basket" and has waived his right to seek a reversal based upon principles of Alabama law. Even were his passing references to John Deere and Malmberg sufficient under Rule 28, Ala. R.App. P., to warrant consideration, there is the well-established principle of appellate review that we will not consider an issue not raised in an appellant's initial brief, but raised only in its reply brief. Birmingham Bd. of Educ. v.Boyd, 877 So.2d 592 (Ala. 2003); Sanders v. Smitherman,776 So.2d 68, 73 (Ala. 2000); C S Family Credit of Alabama, Inc.v. McNairy, 613 So.2d 1232, 1232 (Ala. 1992). Nonetheless, because it is a close question as to whether Wesley's acknowledgment of Alabama caselaw on point only in his reply brief *Page 235 
represents a new "issue," as opposed to simply additional argument in support of an issue properly raised in the initial brief, we will exercise our discretion and consider relevant Alabama caselaw.
Wesley acknowledges that neither this Court nor the Court of Civil Appeals has adopted or cited with approval either of theRestatement sections he cites in his brief. Although Wesley cites decisions from other jurisdictions that have adopted one or both of those sections as a basis for recognizing a factual question on the issue of a hospital's liability for negligent conduct by a physician within a hospital, most of those cases involved patients who arrived at a hospital emergency room and were referred to the "on call" emergency physician (e.g.,Simmons v. Tuomey Regional Medical Center, 341 S.C. 32,533 S.E.2d 312 (2000); Simmons v. St. Clair Memorial Hospital,332 Pa.Super. 444, 481 A.2d 870 (1984)); patients who were treated by physicians whose practice was necessarily hospital-based, frequently under an "exclusive service contract" with the hospital, and as to whom the patient frequently had no knowledge or choice in selection, such as anesthesiologists, pathologists, and radiologists (e.g., Sword v. NKC Hospitals, Inc.,714 N.E.2d 142, 150 n. 11 (Ind. 1999)); and patients treated at hospitals that had conducted massive advertising campaigns designed to create the impression that the hospital vouched for the competence of the physicians practicing in specialty departments of the hospital (e.g., Glover v. St. Mary's Hospitalof Huntington, Inc., 209 W.Va. 695, 551 S.E.2d 31 (2001)). Concerning the nature of hospital advertising extensive enough to give rise to vicarious liability, the Supreme Court of Appeals of West Virginia described in Glover what it found to be sufficient under the particular circumstances before it, where the wife of a hospitalized sedated cancer patient requiring surgery had selected a surgeon having staff privileges at the hospital because she believed, based on the hospital's advertising campaign, that it would not allow a surgeon to practice in its institution unless it had verified his competence to do so. The wife stated that she received that impression,
 "from the `Healthy Monday' advertising series which she saw `almost every time I watched the news' and from reading the local newspaper.
 "Also attached to the [wife's] response was a videotape which shows examples of the `Healthy Monday' advertising campaign the hospital conducted on television for several years. The campaign covered a wide range of illnesses and health issues including the prevention and treatment of breast cancer and prostate cancer. The format of each `Healthy Monday' commercial is essentially the same. A doctor, nurse, or technician from the appropriate department of the hospital explains the health issue which is the focus of the commercial. The health care provider then discusses potential preventive measures the viewers may be well-advised to heed and treatment for the illness. Each commercial ends with an announcement that a local television station and the hospital are responsible for the advertisement. St. Mary's logo is then projected on the screen.
 "The `Healthy Monday' campaign is also published regularly in Huntington newspapers. Once again, the St. Mary's Hospital logo is prominently located on each advertisement. The campaign stresses that the hospital contains nationally recognized regional heart and cancer centers. The advertisements list the names of doctors and other medical professionals who perform specific surgical techniques and other tasks in the hospital. Each advertisement in the *Page 236 
series discusses a potential health problem and provides an in-depth explanation of medical assistance offered by the hospital and once again affirms that the `page [is] brought to you by St. Mary's Hospital.' The appellant does not allege that St. Mary's advertised on billboards; however, we note that some hospitals attempt to draw business by displaying photographs of physicians and surgeons who practice in their facility on billboards advertising the hospital.
 "The [wife] states that the image St. Mary's projects of itself through its advertising campaign is that of a full-service hospital which is prepared to address a multitude of patient needs, including those of a cancer patient. She states that she believed she could rely on the hospital to accept responsibility for the quality of care her husband received based, in part at least, on the image the hospital chose to project through this advertising campaign."
209 W.Va. at 698-99, 551 S.E.2d at 34-35.
In Malmberg, supra, this Court explained the test for determining when an agency by "estoppel" or by "apparent authority" exists:
 "[The plaintiff] argues that [the defendant automobile dealership] could be found to be the agent of American Honda either through an agency by estoppel or through an apparent agency. The test for determining whether an agency existed by `estoppel' or by `apparent authority' is based upon the potential principal's holding the potential agent out to third parties as having the authority to act:
 "`While some suggestion has been made that a distinction exists between apparent authority and authority grounded on estoppel, . . . our cases and authority generally base the two upon the same elements.
 "`"`As between the principal and third persons, mutual rights and liabilities are governed by the apparent scope of the agent's authority which the principal has held out the agent as possessing, or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny.'
 "`"Such apparent authority is the real authority so far as affects the rights of a third party without knowledge or notice. . . ." . . .
 "`"When one has reasonably and in good faith been led to believe, from the appearance of authority which a principal permitted his agent to exercise, that a certain agency exists, and in good faith acts on such belief to his prejudice, the principal is estopped from denying such agency. . . ." . . .
 "`"The apparent authority of the agent is the same, and is based upon the same elements as the authority created by the estoppel of the principal to deny the agent's authority; that is to say, the two are correlative, inasmuch as the principal is estopped to deny the authority of the agent because he has permitted the appearance of authority in the agent, thereby justifying the third party in relying upon the same as though it were the authority actually conferred upon the agent."'
 "Pearson v. Agricultural Insurance Co., 247 Ala. 485, 488, 25 So.2d 164, 167 (1946) (citations omitted); see Wood v. Shell Oil Co., supra, 495 So.2d [1034] at 1038 [(1986)]. The doctrine of apparent authority is based upon the actions of the principal, not those of the agent; it *Page 237 
is based upon the principal's holding the agent out to a third party as having the authority upon which he acts, not upon what one thinks an agent's authority might be or what the agent holds out his authority to be. See Automotive Acceptance Corp. v. Powell, 45 Ala.App. 596, 234 So.2d 593 (Ala.Civ.App. 1970), quoted with approval in Massey-Ferguson, Inc. v. Laird, 432 So.2d 1259 (Ala. 1983)."
644 So.2d at 891.
In Union Oil Co. of California v. Crane, 288 Ala. 173, 180,258 So.2d 882, 887 (1972), this Court quoted extensively fromPearson v. Agricultural Insurance Co., 247 Ala. 485,25 So.2d 164 (1946), as did the Malmberg Court, including the explanation that apparent authority and authority grounded on estoppel are based upon the same elements such that "`the two are correlative.'" 288 Ala. at 178, 258 So.2d at 885-86. The Court went on to explain that "there must be a reliance on the part of the injured person before liability can be engrafted through the doctrine of respondeat superior, by estoppel, on the master,"288 Ala. at 179, 258 So.2d at 887, and then quoted the following rule from Birmingham News Co. v. Birmingham Printing Co.,209 Ala. 403, 405, 96 So. 336, 339 (1923):
 "`"Estoppel," by holding out another as the agent of the asserted principal, "is always a matter personal to the individual asserting it and he must therefore show that he was misled by the appearances relied upon. It is not enough that he might have been, . . . so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough."'"
288 Ala. at 180, 258 So.2d at 887.
 "[B]efore there can be apparent authority that implies an agency relationship, the `authority' must be `apparent' to the complaining party and that party must have relied on the appearance of authority; he cannot rely on an appearance of authority that he was ignorant of."
Watson v. Auto-Owners Ins. Co., 599 So.2d 1133, 1136 (Ala. 1992) (emphasis supplied).
Our latest occasion to address the doctrines of apparent authority and agency by estoppel was last year in John DeereConstruction Equipment Co. v. England, supra. As noted, Wesley cites this case in his reply brief, but only for the purpose of stating summarily that the plaintiff in John Deere had not proved elements of the doctrines, whereas Wesley had. The opinion in John Deere contains a helpful survey of some of the pertinent law, including Malmberg. Quoted with approval fromMalmberg was the proposition that, although "`[a]gency is generally a question of fact to be determined by the trier of fact,'" nonetheless, "`[w]hen a defendant's liability is to be based on agency, agency may not be presumed.'" John Deere,883 So.2d at 178, quoting Malmberg, 644 So.2d at 890. Rather, when a party moving for a summary judgment has made a prima facie showing that no agency relationship existed, the party asserting agency has the burden of presenting substantial evidence of the alleged agency. Malmberg, 644 So.2d at 890, John Deere,883 So.2d at 178.
Wesley attempts to distinguish between apparent authority and agency by estoppel, arguing that "unlike apparent authority, agency by estoppel requires detrimental reliance by the plaintiff." (Wesley's brief, p. 15.) Wesley goes on to argue, in essence, that if a hospital sufficiently "holds itself out" through extensive advertising and otherwise as a hospital that employs obstetricians, then the hospital may be held vicariously liable, under the doctrine of apparent authority, for the *Page 238 
negligence of an obstetrician delivering babies at the hospital, without the necessity for any proof that the patient in question had been exposed to the advertising and relied on it in choosing the obstetrician. Although some cases from other jurisdictions seem to have adopted such a view, e.g., Kashishian v. Port,167 Wis.2d 24, 481 N.W.2d 277 (1992), we see no reason, under the facts of this case, to abandon our rule that "before there can be apparent authority that implies an agency relationship, the `authority' must be `apparent' to the complaining party and that party must have relied on the appearance of authority; he cannot rely on an appearance of authority that he was ignorant of."Watson, 599 So.2d at 1136.
Thus, we apply the criteria discussed in Watson, supra, andMalmberg, supra, to those facts Wesley relies on as establishing a genuine issue of material fact concerning the existence of apparent agency or agency by estoppel between St. Vincent's and Dr. Brown. That, in turn, relegates our review to the contents of Ms. Brown's affidavit, insofar as Wesley's submission in opposition to St. Vincent's summary-judgment motion was concerned. The record before the trial judge at the summary-judgment hearing contained other materials, as will be noted.
In his reply brief, Wesley suggests that Ms. Brown's affidavit testimony is supported by deposition testimony of Dr. Brown to the effect that she had received a few patients "through St. Vincent's Dial-a-Nurse program," which he characterizes as St. Vincent's "physician referral program." (Wesley's reply brief, p. 4.) Wesley never made this argument to the trial court, however, and he raises it before this Court only in his reply brief. "`This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.' Andrews v. Merritt OilCo., 612 So.2d 409, 410 (Ala. 1992)." Crutcher v. Wendy's ofNorth Alabama, Inc., 857 So.2d 82, 97 (Ala. 2003). See alsoByrd v. Lamar, 846 So.2d 334, 341 (Ala. 2002). In any event, Dr. Brown testified that she did not know how the "Dial-a-Nurse" program worked and that she did not know if she ever got any obstetrical patients, as opposed to gynecological patients, as a result of that program. As noted earlier, although Wesley references in his brief the video clips he obtained under subpoena from Intermark Group, he does not argue that we should consider the content of any of that material in evaluating his factual showing concerning St. Vincent's "holding out" its services as employing obstetricians; rather, as will be discussed later, he discusses that material only in support of his contention that the trial court erred in restricting the scope of his discovery.
In our review of Ms. Brown's affidavit, we are mindful that we should view all facts stated in her affidavit most favorably to the plaintiff, but we are also mindful that "[s]ummary judgment is not prevented by `conclusory allegations' or `speculation' that a fact issue exists. Bare argument or conjecture will not satisfy a [nonmovant's] burden to offer facts to defeat the motion." Riggs v. Bell, 564 So.2d 882, 885 (Ala. 1990) (citations omitted). This Court has reiterated this principle frequently since Riggs, citing that case: McGarry v.Flournoy, 624 So.2d 1359, 1361 (Ala. 1993); Crowne Invs., Inc.v. Bryant, 638 So.2d 873, 878 (Ala. 1994) ("[M]ere conclusory allegations or speculation that fact issues exist will not defeat a properly supported summary judgment motion, and bare argument or conjecture does not satisfy the nonmoving party's burden to offer facts or to defeat the motion."); Blackburn v. State FarmAuto. *Page 239 Ins. Co., 652 So.2d 1140, 1142 (Ala. 1994); Huff v. UnitedIns. Co. of America, 674 So.2d 21, 24 (Ala. 1995); and Reid v.Jefferson County, 672 So.2d 1285, 1290 (Ala. 1995) ("[the nonmovant's] statements are conclusory. Thus, those statements do not constitute substantial evidence and, therefore, do not warrant submitting [his] claim to the jury"). This Court has stated: "[A party opposing a summary-judgment motion] must present facts, not merely inferences based upon belief, that counter facts offered in support of the motion." Davis v. FordMotor Credit Co., 599 So.2d 1123, 1125 (Ala. 1992).
With those principles in mind, our review of Ms. Brown's affidavit reveals the following: She states in paragraph 3 that sometime during her pregnancy, but obviously before she went to see Dr. Brown on December 20, 1999, she saw "a" television advertisement by St. Vincent's that "concerned" the "delivery of obstetrical services in birthing suites" at the hospital's "relatively new Women's and Children's Center." That advertisement, she says, "led" her to believe that the hospital was "holding itself out as a hospital that had good obstetricians who provided quality obstetrical services in luxurious birthing suites." In this regard, Ms. Brown has stated only that she saw a television advertisement that "concerned" the delivery of obstetrical services in birthing suites at the Women's and Children's Center. The remainder of her statements in this paragraph of her affidavit are simply conclusory; she does not describe the content of the advertisement or explain how that content "led [her] to believe" that St. Vincent's was holding itself out in the way she subjectively perceived. She provides no facts from which the trial court could determine that her belief was objectively reasonable based on the content of the television advertisement.
In a similar vein, she states in paragraph 11 that she went to Dr. Brown for her prenatal care and the birth of her child "because of the way St. Vincent's Hospital held itself out in its advertising." After seeing the advertisement, she telephoned St. Vincent's to see if, in her words, "they had any obstetricians who were taking on new patients." As she otherwise describes the situation in the last paragraph of her affidavit, she advised the person with whom she spoke that she wanted them to provide her "an obstetrician who was taking on new patients." She does not identify or describe in any way the person to whom she talked, and there is no basis for concluding that that individual would have understood the inquiry to relate to obstetricians employed by the hospital as opposed to obstetricians who participate in a physician-referral program. Her telephone call was transferred to another unidentified person, who took her name and telephone number and told her that "they would have to call [her] back with information on an obstetrician." (Emphasis supplied.) Subsequently, a "representative" of St. Vincent's telephoned her and gave her Dr. Brown's name and advised her of an appointment time that had been scheduled for her. Also, she was given directions to Dr. Brown's office "in the St. Vincent's professional office building." Her statement that she "was directed to Dr. Brown as an obstetrician from St. Vincent's who was taking on new patients" is simply her conclusion based on the details of the telephone conversations she recounts in her affidavit. She states that she was "not given a choice of physicians," but she does not suggest that she asked for more than one name after she had been told that someone would call her back with information on "an obstetrician."
Concerning her subsequent visit to Dr. Brown's office, the materials available to the trial judge as a part of the record at *Page 240 
the summary-judgment hearing included a full copy of Dr. Brown's office records, which, in turn, reflected that Ms. Brown signed paperwork acknowledging "Sparks Favor, P.C." to be the medical-practice group by whom she was to be treated and assigning to that group all insurance benefits to which she was entitled. Those records further reflect that over the course of the next five months preceding Ms. Brown's admission to the hospital for the delivery of her child, she visited Dr. Brown's office on seven occasions. Although Ms. Brown asserts in her affidavit that "[she] looked to the hospital for providing these obstetrical services for [her] and [her] baby," she was never physically at the hospital, which the record reveals to be located at a different street address than the professional office building in which Dr. Brown's office was located, until the date of her induction and delivery on May 12, 2000.
Ms. Brown states in paragraph 6 of her affidavit that she "continued to see this advertising," i.e., the single advertisement referenced in paragraph 3 of her affidavit, during her pregnancy. In paragraph 8 of her affidavit, she states that a "representative" of St. Vincent's telephoned her to inquire if she could move her scheduled induction from May 11 to May 12 "because all their obstetrical beds were going to be full on May 11th." Ms. Brown states that this unidentified representative told her "that its obstetrician, Dr. Brown, could induce me on May 12th so I agreed to that date."
Paragraphs 9 and 10 of the affidavit address the consent-to-treatment form that Ms. Brown undeniably signed. She states that although the nurse who spoke with her when she arrived at the birthing suite presented her with various consent forms to sign, Ms. Brown could not read the forms because she had removed her contact lenses at the nurse's request. The hospital record, also presented to the trial judge at the summary-judgment hearing, contains a consent-for treatment form that Ms. Brown signed on May 12, 2000, upon her arrival at "Room 218." The second paragraph of the form reads as follows:
 "PHYSICIANS: I understand that my doctor and other doctors who provide care to me while I am in the hospital (such as Emergency Department doctors, doctors who read X-rays and test specimens removed from me, and doctors and Certified Registered Nurse Anesthetists who give anesthesia) are not the agents, servants or employees of St. Vincent's Hospital, but are individuals practicing independently at the hospital."
At the bottom of the form, immediately under the statement "I acknowledge that I have read this form and understand its purpose and content," Ms. Brown signed her name.
The various forms she signed on this occasion indicate that they were executed at 10:25 a.m. Ms. Brown was not then in active labor, but rather was at the hospital for Dr. Brown to induce labor. The hospital record and Dr. Brown's deposition, the full transcript of which was made available to the trial judge in connection with the summary-judgment hearing, reflect that labor was not induced until 11:00 a.m. and that Wesley was delivered at 4:26 p.m. Clearly, Ms. Brown was not in the final stages of labor when she arrived at the birthing suite; the hospital records reflect that she was not given any medications until well after she signed the consent-to-treatment form. She attempts to avoid the import of the form by stating that she could not read the form because she had removed her contact lenses and that the nurse told her that "this paperwork was just something that could be gone over *Page 241 
very briefly and that the hospital has everybody sign the paperwork and it's no big deal." Ms. Brown states that the nurse "did not read the consent forms entirely," but she does not suggest that she ever requested that the nurse read the forms to her or otherwise explain the content of the forms in detail. The second paragraph of the consent-for-treatment form signed by Ms. Brown clearly explained that "[her] doctor" and any other doctors providing her care while she was in the hospital were not "the agents, servants, or employees of St. Vincent's Hospital, but [were] individuals practicing independently at the hospital."
In the final analysis, the evidence presented to the trial judge at the summary-judgment hearing established nothing more than the fact that during Ms. Brown's pregnancy she had seen "a" television advertisement that "concerned" obstetrical services in birthing suites at the Women's and Children's Center, which advertisement somehow led Ms. Brown to believe that "the hospital was holding itself out as a hospital that had good obstetricians who provided quality obstetrical services in luxurious birthing suites." All of Ms. Brown's statements concerning the import of this television advertisement and its effect on her are merely conclusory statements, made without the support of any factual underpinning. They do not constitute substantial evidence indicating that St. Vincent's "held itself out" as an employer of obstetricians; they leave the trial court only to speculate how the advertisement might have engendered the belief Ms. Brown says she entertained.
The fact that Ms. Brown subsequently telephoned the hospital to inquire if "they" had any obstetricians who were taking on new patients, advising the person who answered the telephone that she was pregnant and that she wanted them to provide her "an obstetrician who was taking on new patients," did not serve to elevate the physician referral she received to a representation by the hospital that it employed the obstetrician to whom she was referred. Hospitals are at liberty to provide physician-referral services upon request, as is the Alabama State Bar Association with respect to attorney referrals, without being held, based solely on a response to a direct inquiry, to have represented that the physician to whom the patient is referred is an employee of the hospital. Ms. Brown's mere subjective belief that "Dr. Brown worked for St. Vincent's," based on her interpretation of the circumstances, is not controlling. Rather, the law is concerned with whether it would have been objectively reasonable for a person in her position to entertain that belief. "[A party opposing a summary-judgement motion] must present facts, not merely inferences based upon belief." Davis, 599 So.2d at 1125. A plaintiff relying on apparent agency or agency by estoppel must
 "`show that he was misled by the appearances relied upon. It is not enough that he might have been, . . . so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough.'"
Union Oil Co., 288 Ala. at 180, 258 So.2d at 887 (quotingBirmingham News, 209 Ala. at 405, 96 So. at 339).
Concerning the effect of the disclosure of Dr. Brown's independent status in the consent form, Wesley argues that "[s]imply informing a patient that her doctor and the hospital have a different technical relationship than what the patient expected does not diminish the patient's reasonable reliance on the hospital." Wesley argues that the hospital "should *Page 242 
have posted the employment relationship between itself and the physicians in a conspicuous setting both in the hospital and in St. Vincent's professional office building, and explained and informed Ms. Brown of this restriction before she was prepared to deliver her child." According to Wesley, providing Ms. Brown with that information in the consent form came too late because she was "already delivering her baby." We do not agree that the declaration in the form signed by Ms. Brown informing her that Dr. Brown was not the agent, servant, or employee of St. Vincent's, but was an individual practicing independently at the hospital, was inadequate notification of the relationship between St. Vincent's and Dr. Brown. As noted, at the time Ms. Brown signed the form the induction of labor had not begun and she was free to make other arrangements. However, she chose to proceed under the care of Dr. Brown, whom she had visited at the Sparks 
Favor suite of offices on eight occasions over the course of the past five months, apparently never inquiring concerning the nature of any relationship between Dr. Brown and St. Vincent's. She voluntarily signed the consent form. The following rule is well established in Alabama:
 "`[A] person who signs an instrument without reading it, when he can read, can not, in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents; and the same rule [applies] to one who can not read, if he neglects to have it read, or to enquire as to its contents.'"
Mitchell Nissan, Inc. v. Foster, 775 So.2d 138, 140 (Ala. 2000) (quoting Beck Pauli Lithographing Co. v. Houppert,104 Ala. 503, 506, 16 So. 522, 522 (1894)) (emphasis omitted). "This Court has held that a person who signs a contract document is on notice of the terms therein and is bound thereby, even if he or she fails to read the document." Safeway Ins. Co. of Alabama, Inc.v. Taylor, 758 So.2d 523, 525 (Ala. 1999). There is a general duty on the part of a person to read the documents received in connection with any transaction. Gilmore v. M B Realty Co.,895 So.2d 200 (Ala. 2004). A person signing a document cannot claim lack of ability to read the document if she "voluntarily allows imperfect vision to go uncorrected, such as by not using reasonably available eyeglasses." Massey Auto., Inc. v. Norris,895 So.2d 215 (Ala. 2004). The same is true of contact lenses.
Wesley attempts to avoid the effect of the release by arguing that the nurse obtaining Ms. Brown's signature misrepresented its content and that "[t]he basic presumption is that unless otherwise stated, the physicians and caretakers are hospital employees and not independent contractors." Alabama law does not support that statement (see Parker v. Collins, 605 So.2d 824,827-28 (Ala. 1992)), and we can only respond to Wesley's attempt to avoid the disclosure in the consent form on the basis of misrepresentation by observing that he never made that argument to the trial court. For the same reason, we cannot consider Wesley's argument, raised for the first time on appeal, that we should disregard the disclosure in the consent form because it represents a "one-sided adhesion contract" that it would be "unconscionable" to enforce. Finally, and likewise, we cannot accept Wesley's argument that he should not be bound by the consent form his mother signed because she was not acting as his representative but rather "was consenting to treatment for her labor and delivery needs." This argument was never made to the trial judge; moreover, it misses the point. The significance of the disclosure in the consent form is as it relates to Ms. Brown's awareness of Dr. Brown's status as an *Page 243 
independent practitioner, and the reasonableness, in the face of that disclosure, of any continued subjective belief by Ms. Brown that Dr. Brown was an employee of St. Vincent's.
In light of all of the above, it was appropriate for the trial judge to factor in the effect of the disclosure of Dr. Brown's status in the consent form in determining whether Wesley had carried his burden of establishing by substantial evidence a genuine issue of material fact concerning his claims of apparent authority and agency by estoppel. Given the conclusory nature of much of Ms. Brown's affidavit and its total failure to identify the content of the single television advertisement she saw on several occasions; the generic inquiries she made to unidentified representatives of the hospital and their generic responses; and the unambiguous disclosure in the consent form she signed concerning Dr. Brown's status, we conclude that Wesley did not carry his burden of establishing by substantial evidence a genuine issue of material fact as to the applicability in this case of either the doctrine of apparent authority or the doctrine of agency by estoppel. In particular, he specifically presented the issue to the trial court in terms of whether he could prevail under "[t]he apparent authority theory . . . based on § 429 of the Restatement (Second) of Torts (1965)" or on "[t]he agency by estoppel theory . . . based upon Restatement (Second) ofAgency § 267 (1958)," asserting his belief that this Court "would apply these agency theories in a medical malpractice case." With the issue thus postured, the trial judge did not err in entering the summary judgment for St. Vincent's.
Wesley's final argument is that the trial court erred in not ordering St. Vincent's to produce "[a]dvertising that predated Ms. Brown's pregnancy," and otherwise "unduly restrict[ed] the advertising to only the period of pregnancy." In that regard Wesley argues that although "the plaintiff may not have detrimentally relied on such advertising" it would be relevant to establishing that "the hospital held itself out in the community as employing obstetricians." According to Wesley, advertising by St. Vincent's before, or after, his mother's pregnancy, and which she did not see, would be relevant to establishing how the hospital projected itself to the community. He argues that "[i]t may not have been detrimentally relied upon as required for agency by estoppel, but surely it would be relevant to the `holding out' element of both theories." In this regard, Wesley relies exclusively on cases from other jurisdictions, disregarding the principle of Alabama law quoted earlier that "before there can be apparent authority that implies an agency relationship, the `authority' must be `apparent' to the complaining party and that party must have relied on the appearance of authority; he cannot rely on an appearance of authority that he was ignorant of." Watson, 599 So.2d at 1136. As noted, Ms. Brown asserts only that she saw a single television advertisement, aired on more than one occasion, and she never contended that she saw any other advertising of any sort by St. Vincent's that influenced her belief that it was holding itself out as the employer of obstetricians. Therefore, we conclude that the trial judge did not exceed his discretion in requiring St. Vincent's to produce only advertising, whether through the medium of television or otherwise, that was published or aired during the period August 1, 1999, through December 31, 1999.
Having found no error with respect to the issues argued by Wesley, we affirm the summary judgment entered in favor of St. Vincent's.
AFFIRMED. *Page 244 
SEE, BROWN, and STUART, JJ., concur.
NABERS, C.J., concurs in the result.