PER CURIAM.
Melissa Bain (“Bain”), in her capacity as the personal representative of the estate of her deceased husband, Christopher Heath Bain (“Heath”), appeals from a summary judgment in favor of Colbert County Northwest Alabama Health Care Authority d/b/a Helen Keller Hospital (“HKH”) on the claims asserted against HKH by Bain. For the reasons set forth herein, we affirm.
I. Facts and Procedural History
Heath, who was 30 years old, began complaining of a “lump” in his throat that would not go away. Heath went to his general practitioner on May 23, 2012, and his doctor recommended that he undergo an endoscopy. Between May 23 and June 18, 2012, Heath saw several doctors in an attempt to find out what was causing his symptoms, which included increasing pressure near the base of his skull and fatigue. Shortly after midnight on June 18, 2012, Bain took Heath to the emergency room at Helen Keller Hospital (“the hospital”) after Heath’s symptoms became more severe. Heath’s father had died of an aneurysm at the age of 47, and Heath was aware that he might be at an increased risk of having an aneurysm. Heath also had a history of hypertension—high blood pressure—but he had been released by his primary-care physician from taking medication for hypertension several months before his visit to the emergency room.
Heath was first “triaged” by nurses at the hospital. There is no indication in Heath’s medical records that the nurses who saw Heath at the emergency room took a comprehensive history, including a family history, from Heath at that time. Dr. Preston Wigfall was the emergency-room physician working at the hospital on the night Heath was taken to the emergency room. Dr. Wigfall evaluated Heath, and his custom was to interview a patient and obtain a medical history when he first saw the patient; Dr. Wigfall did not have a specific recollection of what he asked Heath or what Heath told him about his history, but he did remember taking a history from Heath. Dr. Wigfall did not document any information he learned from taking Heath’s history. According to Bain, who was present in Heath’s hospital room, Heath and Dr. Wigfall discussed Heath’s history of hypertension and the fact that he had been released from taking his blood-pressure medication. Heath also discussed other relevant parts of his family and medical history with Dr. Wigfall, including that his father had had an aneurysm.
Heath complained of pain and tightness in his chest, “a very uncomfortable level” of pain related to the lump in his throat, back pain, and pressure behind his ears and into his head. Dr. Wigfall ordered certain tests to be run—an X-ray of Heath’s chest and soft tissue of the neck, a *949 CT scan of his head and sinuses, an EKG, and blood tests—but he was unable to determine from the results of those tests the cause of Heath’s symptoms. Heath was discharged approximately six hours after his arrival with an “unspecified” diagnosis with instructions to follow up with his primary-care physician. Heath followed up with his doctor as instructed and was referred to another doctor to see if a problem with his gallbladder could be causing his symptoms, and Heath subsequently had his gallbladder removed. On July 8, 2012, approximately 20 days after his visit to the emergency room at the hospital, Heath died when a 45-millimeter ascending aortic aneurysm dissected.
On April 7, 2014, Bain, in her capacity as the personal representative of Heath’s estate, filed a medical-malpractice action in the Colbert Circuit Court against HKH and several other defendants.[1] Bain alleged, among other things not pertinent to this appeal, that the emergency-department nurses at the hospital and the emergency-department physician, Dr. Wigfall, breached the applicable standards of care when they treated Heath on June 18, 2012, in the emergency department at the hospital; that Dr. Wigfall, at all relevant times, was acting within the line and scope of his duties and employment as an actual or apparent agent or employee of HKH; and that HKH was vicariously liable for the actions of its nurses and Dr. Wigfall.
On February 16, 2015, HKH moved for a summary judgment on all claims filed against it by Bain. HKH first argued that Dr. Wigfall was an independent contractor, not an employee or agent of HKH, and that there was no evidence to support a contention that Dr. Wigfall was HKH’s apparent agent. Specifically, HKH argued that there was no evidence indicating that it had done anything to hold Dr. Wigfall out as its agent, that there was no evidence indicating that Heath was misled into believing that Dr. Wigfall was HKH’s agent, and that there was no evidence indicating that Heath sought treatment at the hospital based on that belief.
HKH presented evidence indicating that Dr. Wigfall worked at the hospital as a contract employee for a total of eight days in June 2012, including the night Heath was brought to the emergency room. During the time that he worked at the hospital, Dr. Wigfall was a member of its medical staff, and HKH provided all the forms, supplies, equipment, and personnel that he needed to do his job. Dr. Wigfall had a contract with á staffing agency, Weatherby Locums, Inc. (“Weatherby”), that specialized in providing temporary physicians to hospitals as the hospitals had need, and Weatherby had a contract with HKH to provide physicians to staff the hospital’s emergency department. Weatherby gave Dr. Wigfall the option to choose what' shifts he would like to cover at the different hospitals to which Weatherby supplied physicians. HKH paid Weatherby for Dr. Wigfall’s services, and Weatherby, in turn, paid Dr. Wigfall. Dr. Wigfall received a Form 1099 from Weatherby for tax purposes. Dr. Wigfall had never been an employee of HKH and had never been paid by HKH. Dr. Wigfall testified that HKH did . not control the medical decisions he made and that all care and treatment he *950 provided to Heath was based on his own medical judgment.
HKH also argued that it was entitled to summary judgment on Bain’s claims against HKH regarding its nursing staff because, it said, Bain could not produce evidence demonstrating that the nurses’ breach of the standard of care contributed to cause Heath’s death. HKH acknowledged that Bain’s nursing expert, Penne Perry, testified that the HKH nurses who cared for Heath when he arrived at the emergency room breached the standard of care by failing to take a comprehensive history from Heath. However, HKH argued that there was no causal link between the alleged breach—the nurses’ failure to take a comprehensive history from Heath that would have included information about Heath’s father dying from an aneurysm—and Heath’s death; HKH relied on Bain’s testimony that she and Heath discussed with Dr. Wigfall the fact that Heath’s father had suffered an aortic aneurysm; Dr. Wigfall’s deposition testimony that knowledge of Heath’s father’s aortic aneurysm would have made no difference in his assessment and evaluation of Heath; and deposition testimony from Dr. Michael Blavias, Bain’s emergency-physician expert, indicating that the standard of care required Dr. Wigfall to order a chest CT scan to attempt to rule out an aortic aneurysm or dissection, regardless of whether Dr. Wigfall was aware of Heath’s family history.
Bain filed a response and additional evi-dentiary materials to support her contention that HKH was not entitled to a summary judgment as to either the claim against the emergency-room nurses or the claim that HKH is vicariously liable for the negligence of Dr. Wigfall. Regarding the claim against the emergency room nurses, Bain argued that, if the nurses had properly taken a detailed family history from Heath, a reasonably prudent emergency-room physician would have known that Heath’s father had died of ananeurysm, that this would have affected a differential diagnosis,[2] that the proper tests would have been ordered and conducted, that Heath’s condition would have been discovered, that surgery would have been performed, and that Heath would have lived. In support of her theory of causation, Bain presented evidence indicating that Heath was suffering from an aneurysm and an aortic dissection when he went to the emergency room on June 18; that obtaining a family history would be important when assessing a ■ patient with Heath’s symptoms; that, if an emergency-room physician saw a patient with the symptoms Heath had with knowledge of Heath’s family history, the standard of care required the emergency-room physician to order a chest CT with contrast and angiogram; that a chest CT or a transesophogeal écho-cardiogram, if ordered and completed at any time after June 18, 2012, would have diagnosed a thoracic aortic aneurysm and dissection; that surgery would have been needed to treat the dissection; and that, if he had received the proper surgery, Heath had a 90% chance of survival.
Bain also argued that HKH was vicariously liable for the acts of Dr. Wigfall under a-theory of agency by apparent authority. To support her claim, Bain attached her affidavit testimony as follows:
“Just after midnight on June 18, 2012, Heath and I made a joint decision to go to the emergency room due to the symptoms he started having while playing a gig at Mooresville Bar & Grill earlier that night, We knew , that no doctor’s *951 offices were open, so we were limited to hospital emergency rooms to get Heath emergency care. Although it was across the river from where we lived, Heath and I selected Helen Keller Hospital because Helen Keller Hospital had an emergency room available to the public 24/7, and we believed it had the best reputation for caring for patients in this area. Heath and I both felt that Helen Keller would provide the best emergency care and treatment. Heath and I had a strong comfort level with Helen Keller Hospital because we had friends who worked for Helen Keller Hospital, which increased our trust in Helen Keller Hospital and the emergency medical services it provides. Our trust in Helen Keller Hospital was also bolstered by acquaintances who served as technicians or therapists at Keller, as well as by a few doctors who serviced on-call there, as well as by friends who had babies there.
“Heath and I did not go to Helen Keller on June 18, 2012, to see any particular doctor. After Heath was admitted to the Emergency Department, Dr. Wigfall came into the room and spoke to Heath and I. Dr. ... Wigfall had never treated me or my husband before our emergency room visit at Helen Keller Hospital that morning. I did not even know Dr. Wigfall existed prior to that date. Neither Heath nor I knew that Dr. Wigfall emergency room' doctors [sic] working in Helen Keller Hospitals emergency room were not’ employed by Helen Keller Hospital. Nor did this issue cross our minds.
“Upon our arrival at Helen Keller Hospital and throughout our time there, no one told us that Dr. Wigfall was not employed by Helen Keller Hospital. The admissions people did not tell us this. The nurses or care givers did not teE us this. Dr. Wigfall did not teE us this. Nor did they tell us that Dr. WigfaE was an independent contractor. To my knowledge, we were not provided with any document stating that Dr. WigfaE and the other ER doctors were not employees of Helen KeEer Hospital. Dr. WigfaE had a Helen Keller badge and the medical records and forms had Helen Keller’s name on them. Because of these things and because he gave orders that were followed by the staff, I assumed Dr. WigfaE was employed by the Hospital. At all times, I believed Dr. WigfaE was an emergency physician employed by Helen KeEer.
“Neither Heath nor I knew anything about the individual characteristics and qualifications of the ER doctors at Helen KeEer Hospital before we arrived. However, we assumed that Helen KeEer Hospital would only have qualified doctors in its ER, and we trusted that Helen KeEer Hospital would make sure that Heath got good, thorough and appropriate care. We wanted Heath to be treated at Helen KeEer Hospital because we thought Helen KeEer Hospital was a full service hospital, that it had a fuE service emergency room, and that it would be in complete control of Heath’s care. We chose Helen KeEer because of its reputation and standing in the community for providing good emergency services. Heath and I went to the Emergency Department at Helen KeEer. on June 18, 2012, only to seek a diagnosis of and treatment for Heath’s symptoms and complaints. I relied on Helen KeEer to provide good, thorough and proper emergency medical care and treatment of Heath, and 1 trusted them to do that.”
Bain also presented evidence indicating that Dr. WigfaE was the only emergency-room physician. on duty when Heath was taken to the emergency room at the hospital, that the emergency room operated un *952 der HKH’s name and that there was no indication—via signage in the hospital or badges worn by emergency-room physicians—that HKH’s emergency-room physicians were independent contractors. Bain also produced Heath’s medical records from HKH, including forms that Bain or Heath signed when Heath was checking into and out of the hospital, that had only HKH’s name at the top and no suggestion that Dr. Wigfall was not an HKH employee. For exaipple, one document, signed by Bain, states: “I consent to the use and disclosure of protected health information about me by [HKH] and subsidiaries, its employees and agents, including its medical staff for purposes of treatment, payment, [and] health care operations .... ” As noted above, Dr. Wigfall testified that while he was at the hospital he was a member of its medical staff. Heath signed a form that included his discharge instructions, which stated “Thank you for choosing Helen Keller Hospital for your care today” and listed Dr. Wigfall’s name in the “care provided by” field.
Finally, Bain argued that HKH was vicariously liable for Dr. Wigfall’s actions because HKH had a nondelegable duty to provide emergency medical care that fell within the applicable standard of care. She argued that this duty arose from administrative regulations issued by the Alabama State Board of Health (“the Board”) and through an express or implied contract between HKH and Heath.
HKH filed a motion to strike parts of Bain’s affidavit on the ground that she purported to testify as to facts that were not within her personal knowledge, such as statements regarding what Heath purportedly knew or did not know and what he purportedly thought or felt. Following a hearing on the motion to strike and the motion for a summary judgment, the trial court entered an order that stated: “[A]s to those matters relating to Melissa Bain’s belief regarding what her husband, Heath Bain, knew or did not know, or what he thought or felt, [HKH] ’s motion to strike is granted.” On March 23, 2016, the trial court granted HKH’s motion for a summary judgment on all claims pending against it and certified the judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. Bain timely filed a notice of appeal.
II. Standard of Review
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala. 2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. South-Trust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989); Ala. Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala. 1989).”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala. 2004).
*953 III. Analysis
A. The Emergency-room Nurses
First, Bain argues that the trial court erred in granting HKH’s motion for a summary judgment as it pertained to the nurses who treated Heath in the hospital’s emergency room on June 18.
“To prevail in a medical-malpractice action under the Alabama Medical Liability Act CAMLA’), § 6-5-480 et seq. and § 6-5-541 et seq., Ala. Code 1975, a plaintiff must establish 1) the appropriate standard of care, 2) that the defendant health-care provider breached that standard of care, and 3) a proximate causal connection between the healthcare provider’s alleged breach and the identified injury. Morgan v, Publix Super Markets, Inc., 138 So.3d 982, 986 (Ala. 2013). Thus, to survive a defendant health-care provider’s summary-judgment motion alleging the absence of substantial evidence that would establish any one of these three items, the plaintiff must submit—or identify in the existing record—substantial evidence that would in fact establish the challenged item or items. ...
“With regard to proximate causation in an AMLA case, this Court has stated that ‘the plaintiff must prove, through expert medical testimony, that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury.’ University of Alabama Health Servs. Found. v. Bush, 638 So.2d 794, 802 (Ala. 1994) (emphasis added). See also Bradford v. McGee, 534 So.2d 1076, 1079 (Ala. 1988) (‘[T]he plaintiff [in a medical-malpractice action] must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient.’).”
Kraselsky v. Calderwood, 166 So.3d 115, 118-19 (Ala. 2014).
Bain argues that the failure of the emergency-room nurses to obtain Heath’s family history was a breach of the standard of care and that that breach probably caused or contributed to Heath’s death because, as a result of the nurses’ failure to obtain Heath’s family history, Dr. Wigfall was. unaware of Heath’s family history, which affected his differential diagnosis, which affected the types of tests that he ordered, which led to the failure to discover Heath’s aneurysm, so that Heath did not receive life-saving surgery and subsequently died. In other words, if the nurses had obtained the family history, Bain contends, Dr. Wig-fall would have been aware that Heath’s father suffered from an aneurysm, which would have affected his differential diagnosis, which would had led a reasonable emergency-room physician to order a CT scan of Heath’s chest, which would have revealed the aneurysm, which would have led to surgery, and Heath would have lived. Given that argument, Bain contends that a jury should determine whether the nurses’ failure to obtain a family history from Heath was a proximate cause of Heath’s death. In response, HKH argues that there was undisputed evidence that, despite the nurses’ failure to obtain Heath’s family history, Dr. Wigfall was aware of Heath’s family history, particularly the fact that his father had had an aneurysm, and that this undisputed evidence is a fatal defect in Bain’s argument. We agree.
On appeal, Bain does not argue that, even if Dr. Wigfall did have actual knowledge of Heath’s family history, such knowledge would not affect her theory of causation. Instead, she argues that whether Dr. Wigfall was actually told of Heath’s history was a question of fact for the jury. She contends that her deposition testimony *954 “was less than certain” that she or Heath had told Dr. Wigfall about Heath’s family history and that, to the extent that she specifically testified that Dr. Wigfall was told about Heath’s family medical history, a “jury will likely believe that [she] was mistaken” in light of the fact that Dr. Wigfall did not document any family history in Heath’s chart. Bain’s brief, at 21. In her deposition, Bain testified as follows:
“Q. Okay. Tell me what you remember then about seeing Dr. Wigfall that night.
“A. Okay. I remember he came in and he asked the question, so what’s going on tonight, why are you in here. So [Heath] proceeded to tell him I’m hurting, I have this lump in my throat, I have this pressure behind my ears, it’s kind of like up in my neck, my chest is hurting, it’s tight. I just—I just hurt. I really am hurting,
[[Image here]]
“Q. Okay. And did—did Dr. Wigfall say anything in response at that point in time?
“A." I think they discussed—I know at' some point they discussed history of hypertension and Heath had said, you know, I’ve been on—because I don’t know if his blood pressure was high 'that night or if it was fine, but Heath hád' been on blood pressure medicine for years. ... And Dr. McCoy eventually took him off of blood pressure medicine and cleared him and said looks good to me, what you’re doing is working, keep it up. So I know that was discussed in the visit with Dr. Wigfall about, you know, his history of hypertension, that he’d been taken off his medicine recently—or not recently, but several months prior and his blood pressure had been maintaining at a steady and healthy level. ... And then I know that Dr. Wigfall ordered a chest x-ray and a CT of Heath’s sinuses to see if the pain in his—I guess the lump in his throat and if the pain in his ears could be sinus-related. ...
“Q. Okay. All right. So he comes in, has that discussion?
“A. Uh-huh.'
“Q. Anything else you remember about the initial discussion with Dr. Wig-faíl?,
“A. I mean—I’m 99 percent sure—98 percent sure that we discussed history, too, because that would have come up in the hypertension discussion I know because that’s part of Heath’s history. And at that point now we’re all kind of getting a little worried because this is not something that’s normal. So I know we discussed, just in general history, you’ve been on, medication, my. father has a history of aneurysm, or I forget if it came up my father died of one, or if we—I .don’t remember-, exactly how it came up, but I know we discussed family history and medical history. I know that was part of this discussion.
“Q. Okay. With Dr. Wigfall?
“A. Yes.
“Q. Okay. So is it your testimony that y’all would have discussed the family history that his father had of having an aneurysm?
“A. Uh-huh.
' “Q. Is that a‘yes?’
“A. I’m going to say ‘yes.’
“Q. And all that would have taken place in the first conversation?
“A. I don’t know if it was the first conversation or not, but it was that night sometime.
“Q. Okay. I take ⅝ there were nurses that were in and out of the room checking on him?
“A. Yes.
*955 “Q. Did y’all ever provide a history to any of the nurses that there had been a family history of an aneurysm?
“A. I don’t know. I know it came up. I know I had that discussion that night. I don’t remember exactly who all I had it with. I know I had it.”
Bain testified that she “knew” that Heath’s family history was discussed with Dr. Wigfall, although she was unclear at what point that discussion occurred or with whom else Heath might have discussed his family history. Additionally, Dr. Wigfall testified that he remembered taking a history from Heath, although he could not specifically recall what he asked or what Heath told him. None of the evidence produced by Bain in response to HKH’s motion for a summary judgment created a question of fact as to whether Dr. Wigfall obtained a family .medical history from Heath, including that Heath’s father had had an aneurysm. -
In light of this undisputed testimony, Bain’s theory of causation fails. Under Bain’s theory of causation, the emergency-room nurses’ failure to obtain Heath’s fam-. ily history matters only if Dr. Wigfall otherwise failed to receive Heath’s family history. Bain does not argue otherwise. Given that there was undisputed evidence that Dr. Wigfall received from Heath the information the nurses allegedly should, have obtained from Heath, Bain failed to present substantial evidence demonstrating that the nurses’ failure to obtain Heath’s family history probably caused or contributed to Heath’s death. Accordingly, the summary judgment in favor of EÍKH in regard to Bain!s claims against the emergency-room' nurses is due to be affirmed.[3]
B, Apparent Authority
Next, Bain argues that the trial court erred in entering a summary judgment in favor of HKH on her claim’ that HKH was vicariously liable for the negligence of Dr. Wigfall:
“[U]nder the doctrine of respon-deat superior a principal is vicariously liable for the torts of its agent if the tortious acts are committed within the line and scope of the agent’s employment.” Martin v. Goodies Distribution, 695 So.2d 1175, 1177 (Ala. 1997). On the other hand, “a party is ordinarily not liable for the tor-tious act of his independent contractor.” Id. “The test for determining whether a person is an agent or employee of another, rather than an ■ independent contractor with that other person, is whether that other person has reserved the right of control over the means and method by which the person’s work will be performed ....” Id. In the present case, HKH made a prima facie showing that Dr. Wigfall was an independent contractor, not an agent or employee of HKH, because HKH did not reserve a right to control the means or the method of Dr. Wigfall’s work in the hospital. Accordingly, the burden shifted to Bain, the party asserting the existence of an agency relationship, to present substantial evidence of the existence of a genuine issue of material fact regarding the alleged agency.
Bain conceded that there was no evidence indicating that Dr. Wigfall was as an actual agent of HKH, but she argued *956 that Dr. Wigfall could be found to be the agent of HKH on a theory of apparent agency, which, in Alabama, is also known as agency by estoppel. “The test for determining whether an agency existed by ‘es-toppel’ or by ‘apparent authority’ is based upon the potential principal’s holding the potential agent out to third parties as having the authority to act.” Malmberg v. American Honda Motor Co., 644 So.2d 888, 891 (Ala. 1994). “Agency is generally a question of fact to be determined by the trier of fact,” and, “[w]hen a defendant’s liability is to be based on agency, agency may not be presumed .... ” Id. at 890. Alabama law on the doctrine of agency by estoppel, or apparent authority, was summarized in Malmberg as follows:
“‘While some suggestion has been made that a distinction exists between apparent authority and authority grounded on estoppel, ... our cases and authority generally base the two upon the same elements.
“ ‘ “ ‘As between the principal and third persons, mutual rights and liabilities are governed by the apparent scope of the agent’s authority which the principal has held out the agent as possessing, or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny.’
“ ‘ “Such apparent authority is the real authority so far as affects the rights of a third party without knowledge or notice ....” ...
“ ‘ “When one has reasonably and in good faith been led to believe, from the appearance of authority which a principal permitted his agent to exercise, that a certain agency exists, and in good faith acts on such belief to his prejudice, the principal is estopped from denying such agency .... ” ...
“ ‘ “The apparent authority of the agent is the same, and is based upon the same elements as the authority created by the estoppel of the principal to deny the agent’s authority; that is to say, the two are correlative, inasmuch as the principal is estopped to deny the authority of the agent because he has permitted the appearance of authority in the agent, thereby justifying the third party in relying upon the same as though it were the authority actually conferred upon the agent.” ’
“Pearson v. Agricultural Insurance Co., 247 Ala. 485, 488, 25 So.2d 164, 167 (1946) (citations omitted); see Wood v. Shell Oil Co., 495 So.2d [1034,] 1038 [ (Ala. 1986) ]. The doctrine of apparent authority is based upon the actions of the principal, not those of the agent; it is based upon the principal’s holding the agent out .to a third party as having the authority upon which he acts, not upon what one thinks an agent’s authority might be or what the agent holds out his authority to 'be. See Automotive Acceptance Corp. v. Powell, 45 Ala.App. 596, 234 So.2d 593 (Ala. Civ. App. 1970), quoted with approval in Massey-Ferguson, Inc. v. Laird, 432 So.2d 1259 (Ala. 1983).”
644 So.2d at 891. The third party’s belief that an individual is an agent or employee of the principal must be “objectively reasonable”; what the third party “subjectively perceived” is immaterial to the analysis. Brown v. St. Vincent’s Hosp., 899 So.2d 227, 239 (Ala. 2004).
As indicated above, this Court has held that “ ‘there must be a reliance on the part of the injured person before liability can be engrafted through the doctrine of respondeat superior, by estoppel, on the master.’ ” Brown, 899 So.2d at 237 (quoting Union Oil Co. of California v. Crane, *957 288 Ala. 173, 179, 258 So.2d 882, 887 (1972) (emphasis added)).
“““Estoppel,’ by holding out another as the agent of the asserted principal, ‘is always a matter personal to the individual asserting it and he must therefore show that he was misled by the appearances relied upon. It is not enough that he might have been, ... so misled. It must also appear 'that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough.’ ” ’
“[Crane,] 288 Ala. at 180, 258 So.2d at 887.
“ ‘[B]efore there can be apparent authority that implies an agency relationship, the “authority” must be “apparent” to the complaining party and that party must have relied on the appearance of authority; he cannot rely on an appearance of authority that he was ignorant of.’
“Watson v. Auto-Owners Ins. Co., 599 So.2d 1133, 1136 (Ala. 1992) (emphasis supplied).”
Brown, 899 So.2d at 237 (first emphasis added).
Accordingly, in order to prevail on her claim that HKH was vicariously liable for the negligence of Dr. Wigfall on a theory of agency by estoppel, Bain was required to prove: (1) that HKH acted in such a manner as to hold Dr. Wigfall out as its employee or agent or permitted Dr. Wig-fall to hold himself out as HKH’s employee or agent; (2) that, because of those acts, Heath had an objectively reasonable basis for believing that Dr. Wigfall was HKH’s employee or agent; and (3) that Heath actually relied on the appearance that Dr. Wigfall was an agent or employee of HKH.
In Brown, supra, this Court considered whether a hospital was vicariously liable for malpractice allegedly committed by an obstetrician who was not an employee of the hospital on a theory of agency by estoppel. In that, case, Wesley Brown, a minor proceeding by and through his mother , and next friend, Stephanie Brown, brought a medical-malpractice action against Stephanie’s obstetrician and St. Vincent’s Hospital, among others, based on injuries Wesley suffered during his delivery. Wesley’s action against the hospital was based on an allegation that St. Vincent’s “ ‘held itself out as having a labor and delivery unit for the birthing needs of mothers and their babies and at all relevant times was a healthcare provider that held itself out as providing competent obstetrical care.’ ” Brown, 899 So.2d at 230. Wesley responded to St. Vincent’s motion for a summary judgment by filing an affidavit from his mother, Stephanie, who testified that she saw an advertisement on television that led her to believe that St. Vincent’s had good obstetricians who provided quality obstetrical services in luxurious birthing suites; that she telephoned St. Vincent’s and asked for a referral for an obstetrician; and that she was directed to one obstetrician “from” .St. Vincent’s who was taking new patients. Other evidence in the record indicated that Stephanie signed documents indicating that she was being treated by a specific medical group of which her ■ obstetrician was a member; that she had several appointments with her obstetrician during her pregnancy at a facility outside St. Vincent’s Hospital; and that Stephanie signed a consent-to-treatment form on the day she had scheduled an inducement that specifically stated that the doctors providing her care were not the agents or employees of St. Vincent’s Hospital.
Regarding Stephanie’s affidavit, this Court held that the “statements concerning the import of [the] television advertise- *958 merit and its -effect on her [were] merely conclusory statements, made without the support of any factual underpinning”; therefore, “[t]hey [did] not. constitute substantial evidence that St. 'Vincent’s ‘held itself out’ as- an employer of obstetricians.-’’ 899 So.2d- at 241. Further, the- Court concluded that St. Vincent’s was free to make physician referrals without a referral being elevated to “a representation by the hospital that it employed the physician.to whom she was referred.” 899 So:2d at 241. The Court reiterated that Stephanie’s subjective belief that her obstetrician worked for St. Vincent’s was not controlling; instead, “the law is concerned with whether it would have been objectively reasonable for a person in her position to entertain that belief.” 899 So.2d at 241.
Wesley also attempted “to avoid the effect of the release by arguing that the nurse obtaining [Stephanie]’s signature misrepresentéd its content and that ‘the basic presumption is that unless otherwise stated, the physicians and caretakers are hospital employees and not independent contractors.’ ” 899 So.2d at 242. However, the Court rejected the notion that agency should' be presumed “unless otherwise stated.” Id. (citing Parker v. Collins, 605 So.2d 824, 827-28 (Ala. 1992) (noting that a physician’s use of hospital facilities in conducting a mammogram and billing through the hospital did not establish an agency relationship)). Thus, given the “conclusory nature of much of [Stephanie]’s affidavit,” “the generic inquiries she made to unidentified representatives of the hospital and their generic responses[,] and the unambiguous disclosure in the consent form she ■ signed concerning [Stephanie’s obstetrician’s] status,” the Court concluded that “Wesley did not carry his burden of establishing by substantial evidence a genuine issue of material fact as to the applicability in this case of either the doctrine of apparent authority or the doctrine of agency by estoppel.” 899 So.2d at 243.
Brown is distinguishable from the present case for multiple reasons,-one of which, is that Bain did not attempt to prove that HKH, through advertising, held itself out as employing the doctors that worked in its emergency room. In support of her contention -that HKH acted in such a manner as to hold Dr. Wigfall out as its agent or employee, Bain points to evidence indicating (1) that HKH operates an emergency room that is available to the public 24 hours a day, 7 days a week; (2) that HKH provided the facility and all the forms,supplies, tools, equipment, and personnel for Dr. Wigfall during his evaluation and treatment of Heath; (3) that there were no signs- in the emergency department disclosing Dr. Wigfall’s status as an independent contractor; (4) that nothing on Dr. Wigfall’s badge indicated that he worked for any entity other than. HKH; (5) that none of the documents the Bains signed disclosed that Dr. Wigfall was an independent contractor but, instead,-, included statements that would “lead lay persons like the Bains to believe that Dr. Wigfall was a HKH employee.”[4] Bain’s brief, at 29.
To the extent that Bain argues that. HKH held out to the public that the emergency-room physicians working in the hospital were HKH employees because it operated a full-service hospital with an emergency room that was “open for business,” we must conclude that this evidence is not sufficient, in itself, to meet the requirement that HKH held out its emergency-room physicians as its employees. .Cer *959 tainly, the mere existence of an emergency department in a hospital cannot be evidence of an affirmative act by HKH from which we could conclude that HKH . held itself out as employing the physicians who worked in the emergency department. See Brown, 899 So.2d at 237 (quoting Birmingham News Co. v. Birmingham Printing Co., 209 Ala. 403, 405, 96 So. 336, 339 (1923) (holding that the injured party’s mere belief &at the authority existed, without cause, is not-enough)). -Further, to the-extent that Bain'contends that HKH held the emergency-room physicians working in the hospital out to the public as hospital employees because HKH did not disclose Dr. Wigfall’s status as an independent contractor, Bain is reversing the burden of proof in an agency-by-estoppel claim so that, instead of requiring the principal to hold the agent out to a third party as having the authority upon which he acts, she is asking this Court to require the principal to give notice of the status of independent contractors. However, Bain cites no authority to support her implicit argument that a principal has such a duty. Additionally, that argument is an indirect way of asking this Court to hold that a patient may presume that a doctor working in a hospital is an employee unless the patient is told otherwise—a presumption this Court has explicitly rejected. See Brown, 899 So.2d at 242 (rejecting, as unsupported by Alabama law, the appellant’s argument that “ £[t]he basic presumption is that unless otherwise stated, the physicians and caretakers are hospital employees and not independent contractors’”).
According to Bain’s affidavit,[5] the reasons she “assumed that Dr. Wigfall was employed by HKH” were because no one ever disclosed to her or to Heath that Dr. Wigfall was- not an employee of HKH; “Dr. Wigfall had a Helen Keller badge”; “medical records and forms had Helen Keller’s name on them”; and Dr. Wigfall “gave orders that were followed by the staff.” Although, it is,clear that Bain (not Heath) “assumed” that Dr. Wigfall was an employee of HKH, her “mere subjective belief ... is not controlling.” Brown, 899 So.2d at 241. The only conduct , of HKH that purportedly led Bain to believe that Dr. Wigfall was an employee was the fact that Dr. Wigfall wore a name badge that had HKH’s name on it and that Heath’s .medical-records and forms had-. HKH’s name on them. Even if this “conduct” by HKH could be considered an act of holding out to the public that the emergency-room physicians working in the hospital were HKH employees, and even if this extremely limited conduct on HKH’s part was sufficient to create a jury question as to whether.it was objectively reasonable for someone to believe that the emergency-room physicians working in the hospital’s emergency room, were HKH employees, there is no evidence in the record indicating that Heath, the injured party, was misled. into believing that the physician working in HKH’s emergency room was a hospital employee based on this or any other conduct by HKH.
Further, even considering the entirety of Bain’s affidavit, Bain failed to present substantial evidence of the element of reliance in her claim of agency by estoppel; that is, she did not present substantial evidence that she or Heath, in seeking treatment at the hospital, relied on any representation, by HKH that the doctor who would treat Heath in the emergen *960 cy room was the agent or employee of HKH. Indeed, Bain testified that the question whether the doctors working in HKH’s emergency room were hospital employees “never crossed our minds.”
Bain argues that “she and Heath relied on HKH’s reputation and its pecuniary responsibility to answer for [the negligence of] Dr. Wigfall,” Bain’s brief, at 25, and that, pursuant to this Court’s decision in Standard Oil Co. v. Gentry, 241 Ala. 62, 1 So.2d 29 (1941), that was all the evidence of reliance required to create a jury question on that element of agency by estoppel.[6] In Standard Oil, the plaintiff slipped and fell at a “Standard Oil” gas station on June 18, 1939. Before March 1, 1939, the Standard Oil Company (“Standard”) operated the station, but, on that date, Standard entered into a lease agreement with Marvin' Young and, thereafter, Standard did not operate or control the station. This Court concluded that there was no evidence indicating that Standard was operating or maintaining the station at the time the accident occurred but that “it was for the jury to determine whether or not ... Standard .. was estopped, so far as plaintiff Was concerned, from claiming it was not operating and maintaining this station wheq his injuries were sustained.” 241 Ala. at 64, 1 So.2d at 31.
The evidence indicated that the plaintiff did business with Standard before March 1, 1939, and that he had specifically transferred his business to Standard after an “an unsatisfactory experience with an independent operator and a desire to- do business with a more responsible party.” 241 Ala. at 64, 1 So.2d at 31. This Court also cited evidence indicating that the “sign exhibited to the public, the license exhibited in the office, both the telephone and the city directory, and all other indications pointed to a continued operation of this station by the company,” and that “plaintiff had no basis for any belief there had been any change in the manner of operation." Id. The plaintiffs evidence, the Court said, tended to show “that he relied upon the apparent operation by the company in continuing to do business at the station.” Id. Standard argued that the principle of agency by estoppel applied only to contracts and not to tort actions that do not arise out of a contract and that, even in such a case, the plaintiff' must demonstrate reliance. In response, this Court, citing Hannon v. Siegel-Cooper Co., 167 N.Y. 244, 60 N.E. 597, 598 (1901), held that the doctrine of agency by estoppel applied equally “ ‘in an action ex delicto as in one ex contractu,’ ” and, regarding the element of reliance, stated:
“So in the instant case plaintiffs evidence tended to show he continued to rely upon the appearance of things, that is, that ... Standard ... was still operating the station where he received his injuries, and according this proof due weight the jury might well infer that his reliance throughout was upon the company’s pecuniary responsibility to answer for any default arising out of his business engagements with it.”
241 Ala. at 65,1 So.2d at 31-32.
The present case in distinguishable from Standard Oil because Standard Oil did not concern a tort committed against the plaintiff by a purported agent of Standard; instead, it concerned whether Standard operated and maintained the premises on *961 which the plaintiff was injured. Thus, the plaintiffs reliance in Standard Oil was based solely on the fact that he had moved his business to Standard in order to deal with a more responsible party and, for all that appeared to the plaintiff and any other objectively reasonable observer, Standard continued to operate and maintain the premises on which the plaintiff was injured, although in actuality it was being operated by someone else. In the present case, Bain is seeking to hold HKH liable for a tort committed by an individual who was not an employee of HKH; she is not seeking to hold HKH liable because she was injured on the premises ostensibly operated and maintained by HKH but actually operated and maintained by another party. Bain has cited no authority from this State to support her contention that relying on HKH’s reputation as a good provider of emergency services is sufficient to show that she relied on the purported representations from HKH that the emergency-room physicians working in the hospital were HKH employees in seeking emergency medical care from HKH.
Bain cites authority from several foreign jurisdictions and argues that “a survey of a handful of these decisions shows that HKH should be held vicariously liable in this case.” Bain’s brief, at 34. For example, she cites Gatlin v. Methodist Medical Center, Inc., 772 So.2d 1023 (Miss. 2000), a decision from the Mississippi Supreme Court that held that there was “sufficient evidence for a reasonable trier of fact to conclude” that a hospital could be vicariously liable for the alleged malpractice of an anaesthesiologist who had assisted in an emergency surgery. That decision was based on an earlier decision from that court, Hardy v. Brantley, 471 So.2d 358 (Miss. 1985). In Gatlin, the Mississippi Supreme Court described its decision in Hardy as “representing] a new, and greatly expanded, theory of liability in hospital negligence cases. The Hardy theory of vicarious liability is based primarily upon the relationship between the patient and the health care provider, rather than upon the relationship between the hospital and its physicians.” Gatlin, 772 So.2d at 1027. In Hardy, the court discussed cases from California, Montana, Arizona, Washington, and Ohio that held hospitals liable on a theory of vicarious liability and noted that
“[t]he basic rationale of these cases is that, unless there is some reason for a patient to believe that the treating physician in a hospital is an independent contractor, it is natural for him to assume that he can rely upon the reputation of the hospital as opposed to any doctor, which is the reason he goes there in the first place. These cases recognize his prerogative to make that assumption.”
471 So.2d at 370.
The Mississippi Supreme Court stated its “new, and greatly expanded, theory of liability” as follows:
“Where a hospital holds itself out to the public as providing a given service, in this instance, emergency services, and where the hospital enters into a contractual arrangement with one or more physicians to direct and provide the service, and where the patient engages the services of the hospital without regard to the identity of a particular physician and where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment, the doctrine of respondeat superior applies and the hospital is vicariously liable for damages proximately resulting from the neglect, if any, of such physicians.”
471 So.2d at 371. The Mississippi Supreme Court noted that the rule was consistent with Restatement (Second) of Torts § 429 (1966), which was “consistent with the *962 agency principle of --apparent authority long-recognized in [Mississippi].” 471 So.2d at 370.
Bain argues that “because Alabama follows the general rules of apparent authority, this Court should follow the other states and hold that HKH is vicariously liable for the malpractice committed- by Dr. Wigfall.” Bain’s brief, at 41. However, this Court has never adopted Restatement (Second) of Torts § 429, and to “follow” states such as Mississippi and others cited in Bain’s brief and adopt the rule set forth above would require a wholesale departure from the well settled elements of apparent authority and agency by estoppel set forth in the Alabama cases cited above. Instead of requiring a plaintiff to demonstrate that a hospital acted in such a manner as to hold itself out as employing the doctors who worked in its emergency room, Bain'is asking us to apply a rule that requires only that the hospital hold itself out as providing a given service. Instead of requiring a plaintiff to demonstrate that, because of the hospital’s conduct, the plaintiff was misled into believing that the doctors were hospital employees, Bain is asking us to require only that the plaintiff prove that he or she sought -the services of the hospital without regard to the identity of a particular physician. And instead of requiring that the plaintiff demonstrate that he or she actually relied on the appearance that the doctors working in the emergency room were hospital employees, Bain seeks application of a rule that requires only that the plaintiff show that he or she relied upon the hospital to deliver the desired health care and treatment.
Applying the law from the foreign cases cited in Bain’s brief would, undoubtedly, require a modifiéation of Alabama law or, at the very least, the creation of a special rule for apparent-authority/agency-by-es-toppel claims in hospital cases. See Martin C. Williams, Jr., & Hamilton E. Russell III,'Hospital Liability for Torts of Independent Contractor Physicians, 47 S.C.L. Rev. 431, 450-51 (1996) (noting the “facial attractiveness” of the doctrine, but concluding that “no court assigning hospital liability for independent contractor malpractice on the nominal basis of apparent agency has applied the doctrine with rig- or”; that courts have: “assume[d] away or ignore[d] great chunks of the required analysis”; and that those decisions “advance policy justifications for outcomes favorable to the plaintiff, but such justifications are result-oriented, hospital-specific, and emanate from' the changing public perception of hospitals ... [and] do not justify rejigging the established doctrine” (footnotes' omitted; emphasis added)). Bain maintains that she “does not want this Court to change Alabama law” and that she “wants this Court to enforce Alabama law as it exists right now.” Bain’s reply brief, at 18. Further, Bain does not ask us to overrulé any prior decisions from this Court despite the fact that the rule she would like us to apply is based on the rationale that allows a third party to assume, unless otherwise stated, that a physician working in a hospital’s emergency department is an employee of the hospital. As discussed above, that premise is contrary to Alabama law. Accordingly, we decline to accept Bain’s invitation to apply a “new, and greatly expanded, theory of liability in hospital negligence cases.” Gatlin, 772 So.2d at 1027.
Accordingly, we conclude that Bain has failed to demonstrate that the trial court erred in entering a summary judgment in favor of HKH on Bain’s claim that HKH is vicariously liable for Dr. Wigfall’s alleged negligence. on the basis of apparent authority or agency by estoppel.
C. HKH Owed Heath a Nondelegable Duty
Finally, Bain argues that, even if we conclude that HKH was not vicari *963 ously liable under a theory of agency by estoppel, we should go even further and hold that HKH had a “nondelegable duty to provide Heath with emergency medical physician services within the standard of care.” Bain’s brief, at 64. She contends that a nondelegable duty exists in regula-, tions issued by the Board or from an express or implied contract between Heath and HKH. In Boroughs v. Joiner, 337 So.2d 340 (Ala. 1976), this Court set forth the general rule that “ ‘one is not ordinarily responsible for the negligent acts of his independent contractor. But this rule, as most others, has important exceptions.’ ” 337 So.2d at 342 (quoting Dixie Stage Lines v. Anderson, 222 Ala. 673, 675, 134 So. 23, 24 (1931)).
“One [such exception] is that an employer is responsible for the manner of the performance of certain non-delegable duties, though done by an independent contractor. An employer who by contract or law owes a specific duty to another cannot escape liability for a tor-tious performance by reason of the employment of an independent contractor.”
General Fin. Corp. v. Smith, 505 So.2d 1045, 1047 (Ala. 1987) (emphasis added). Regarding the existence of a duty, this Court has stated:
“‘A legal duty to exercise care, therefore, arises where the parties are bound by contract, Pugh v. Butler Telephone Co., [512 So.2d 1317 (Ala. 1987)], or where the obligations are “expressly or impliedly imposed by statute, municipal ordinance, or by administrative rules or regulations, or by judicial decisions.” 57 Am. Jur. 2d, Negligence § 36 at 382 (1988).’
“King v. National Spa & Pool Inst., Inc., 570 So.2d 612, 614 (Ala. 1990) (emphasis added). See also Thompson v. Mindis Metals, Inc., 692 So.2d 805, 807 (Ala. 1997) (‘A legal duty arises either from the common law or from a statute.’). ‘ “The existence of a duty is a question of law to be determined by the .... court.” ’ Wal-Mart Stores, Inc. v. Smitherman, 872 So.2d 833, 837 (Ala. 2003) (quoting Ex parte Farmers Exch. Bank, 783 So.2d 24, 27 (Ala. 2000)).”
Gowens v. Tys. S., 948 So.2d 513, 527-28 (Ala. 2006).
General Finance Corp. v. Smith, supra, sets forth a classic example of a nondelega-ble duty. In that ease, the plaintiff purchased a truck from a dealership and financed a portion of the purchase through the defendant, General Finance Corporation-. Several months later, after the plaintiff allegedly defaulted on the loan, General Finance repossessed the truck by hiring H & B Recoveries to actually recover the truck. In doing so, H & B breached the peace, which resulted in damage to the plaintiff. At that time] then § 7-9-503, Ala. Code 1975,[7] provided that “ ‘[u]nless otherwise agreed, a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace ....’” 505 So.2d at 1047 (emphasis omitted). After' the jury returned a verdict in favor of the plaintiff, General Finance argued on appeal that H & B was an independent contractor and that, therefore, General Finance could not be liable for H & B’s breach of the peace during the repossession. This Court disagreed and held that, because § 7-9-503 set forth a specific duty on General Finance, as the secured party, to “take those precautions which are necessary at the time to avoid a breach of the- peace ... . '. [General Finance] could not delegate to H & B ... its liability for the wrongful manner in which *964 the repossession was accomplished.” 505 So.2d at 1048.
With that example in mind, we turn to Bain’s argument that HKH had a nondelegable duty to provide emergency medical physician services that fall within the applicable standard of care. Bain first contends that a hospital’s duty to provide emergency medical physician services that fall within the applicable standard of care is found in regulations issued by the Board, specifically Ala. Admin. Code (State Board of Health), Regulations 420-5-7-.04 and 420-5-7-.15. Regulation 420-5-7-.04, which is titled “The Governing Authority,” provides, in pertinent part:
“(1) A hospital shall have an effective governing authority that is legally responsible for the conduct of the hospital as an institution.
[[Image here]]
“(5) Contracted services. The governing authority shall be responsible for services furnished in the hospital whether or not they are furnished under contracts. The governing authority shall ensure that a contractor of services (including one for shared services and joint ventures) furnishes services that permit the hospital to maintain compliance with the requirements of these rules.
“(a) The governing authority shall ensure that the services performed under a contract are provided in a safe and effective manner.
“(b) The hospital shall maintain a list of all contracted services, including the scope and nature of the services provided.”
(Emphasis added.)
Bain argues that the above-emphasized language imposes a “nondelegable duty on hospitals for the conduct of their emergency room physicians irrespective whether they are employees or independent contractors.” Bain’s brief, at 58. However, Bain wholly fails to address Ala. Admin. Code (State Board of Health), Regulation 420-5-7-04(4), the subsection immediately preceding the subsection regarding “contracted services,” which sets .forth the regulations regarding “care of patients” and states that medical doctors, not hospitals, are responsible for the care of each patient. Subsection (4) states, in pertinent part:
“(4) Care of patients. In accordance with hospital policy, the governing authority shall ensure that the following requirements are met:
“(a) Every patient is under the care of:
“1. A doctor of medicine or osteopathy ...;
[[Image here]]
“(b) Patients are admitted to the hospital only on the recommendation of a licensed practitioner. If a patient is admitted by a practitioner not specified in this rule, that patient is under the care of a doctor of medicine or osteopathy.
“(c) A doctor of medicine or osteopathy is on duty or on call at all times.
“(d) A doctor of medicine or osteopathy is responsible for the care of each patient with respect to any medical or psychiatric problem that:
“1. Is present on admission or develops during hospitalization .... ”
(Emphasis added.)
Thus, when Regulation 420-5-7-.04(5)(a) is read together with Regulation 420-5-7-.04(4) and the context of those subsections is considered, it is clear that the regulations do not impose a specific duty on a hospital to provide its patients with emergency medical physician services that fall within the applicable standard of care for an emergency-room physician and that, instead, each doctor practicing in the hospital is ultimately responsible for the medi *965 cal care rendered to the patients that he or she treats. Furthermore, as amicus curiae Alabama Hospital Association points out, Regulation 420-5-7-.04(5)(a) applies to any potential services performed pursuant to a contract with a hospital, which could include anything from janitorial services to bookkeeping, in addition to physician services. Thus, we cannot conclude that a general statement with such broad application is specific enough to create a duty on a hospital to provide emergency medical physician services that fall within the applicable standard of care.
Bain also cites Ala. Admin. Code (State Board of Health), Regulation 420-5-7-.15, which is titled “Emergency Services,” which she says creates a nondelegable duty for HKH: ■
“(1) The hospital shall meet the emergency needs of patients in accordance with acceptable standards of practice.
“(2) Organization and direction.
“(a) The services shall be organized under the direction of a qualified member of the medical staff.
“(b) The services shall be integrated with other departments of the hospital.
“(c) The policies and procedures governing medical care provided in the emergency service or department shall be established by, and are a continuing responsibility of, the medical staff.
“(3) Personnel.
“(a) The emergency services shall be supervised by a qualified member of the medical staff.
“(b) There shall be adequate medical and nursing personnel qualified in emergency care to meet the written emergency procedures and needs anticipated by the facility.”
(Emphasis added.) The plain language of Regulation 420-5-7-.15 requires a hospital to properly organize, staff, and equip emergency rooms to meet the emergency needs of patients in accordance with acceptable standards of practice of hospitals, not physicians. It does not impose a specific duty that the hospital provide emergency physician services that are within the applicable standard of care for emergency-room physicians.
The question we must ask ourselves in this case is what specific duty did HKH delegate to Dr. Wigfall that Dr. Wigfall allegedly negligently performed? As set forth in the regulations cited above, a hospital has a duty to provide “adequate” and “qualified” medical personnel for its patients, i.e., the services of physicians, in order to properly staff its emergency room, and there is no argument that HKH violated that duty. Dr. Wigfall, on the other hand, allegedly violated his duty of care as an emergency-room physician, i.e., he allegedly negligently performed the duties he owed Heath as his physician. The duty of care owed to a patient by a physician is distinct from the duty of care owed to a patient by a hospital. See § 6-5-484(a), Ala. Code 1975 (setting forth the duty of care owed by a physician and by a hospital, respectively). Unlike the circumstances in General Finance, supra, where H & B tortiously performed General Finance’s specific statutory duty not to breach the peace, Dr. Wigfall in the present case did not tortiously perform one of HKH’s duties. Dr. Wigfall allegedly tortiously performed his duty as a physician to “exercise such reasonable care, diligence, and skill as physicians ... in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case.” § 6-5-484(a).
' In light of the distinct duties owed patients by hospitals and physicians and Bain’s failure to identify a regulation that imposes a specific duty upon a hospital to provide its patients with emergency medical physician services that are within the applicable standard of care, see General *966 Fin. Corp. v. Smith, 505 So.2d at 1047, we conclude that Bain has failed to demonstrate that the Board’s regulations impose a -duty on a hospital to provide emergency physician services that are within the applicable standard of care. ■
Even if there were some language in the Board’s regulations that could, possibly be construed as imposing a duty on a hospital to provide emergency physician services that are within the applicable standard of care, Bain has not cited any authority indicating that the legislature has given the Board authority to create such a duty, i.e., a duty that did not otherwise exist by statute or in the common law. The legislature has given the Board authority to promulgate “reasonable rules and regulations governing the operation and conduct of hospitals” that are confined to “setting minimum standards of sanitation ■ and equipment found to be necessary and prohibiting conduct and practices inimical to the public interest and the public health.” § 22-21-28, Ala. Code 1975. Given that the legislature, in the Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-541 et seq., Ala. Code 1975 (“the AMLA”), set forth the duty that a hospital owes to a patient, see § 6-5-484, we- are not persuaded that the legislature, gave the Board authority to create a nondelegable duty to be imposed on hospitals beyond what was specifically set forth by the legislature in the AMLA. See § 22-21-28 (“The [B]oard shall not have power to promulgate any regulation in conflict with law .... ”). Bain has not argued that anything in the AMLA creates a duty requiring hospitals to provide emergency medical physician services that fall within the applicable standard of care.
In addition to all. the above, the two regulations Bain .primarily relies upon are taken, nearly verbatim, from federal regulations promulgated by the Centers for Medicare and Medicaid Services “for the purposes of . determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid.” 42 C.F.R. § 482.1. For example, like Regulation 420-5-7-.04(5)(a), 42 C.F.R. § 482.12(e)(1) requires the governing body of the hospital to “ensure that services performed under a contract are provided in a safe and .effective manner.” Also, Regulation 420-5-7-.15 -is substantively. identical to 42 C.F.R. § 482.55, which provides, in pertinent part, that “[t]he hospital must meet the emergency needs of patients in accordance with acceptable standards of practice.”[8] It seems likely that the Board’s regulations, insofar as they substantially mirror federal regulations for determining whether a hospital will qualify for a'provider agreement with Medicare and Medicaid, were issued for that purpose and not in an attempt to create a new nondelegable duty for hospitals to provide emergency medical physician services that are within the applicable standard of care.
Thus, for all the foregoing reasons, we cannot conclude that the trial court erred in concluding that the Board’s regulations do not create a nondelegable duty on hospitals to provide emergency medical physician services that fall within the applicable standard of care.
*967 Bain also argues that there was an express or an implied contract between Heath and HKH that imposed upon HKH the duty to provide Heath with emergency medical physician services that fall within the applicable standard of care. Initially, we note that the specific language Bain cites from Heath’s hospital-admission forms as the basis of her claim that .there was an express contract is cited for the first time on appeal. Regardless, Bain has not directed our attention to any language in that “paperwork” whereby HKH took upon itself a contractual duty to- provide Heath with emergency physician services that fall within the applicable standard of care. To be sure, hospitals owe-patients a duty of care. However, this Court has long held that such a duty sounds in tort and, as noted above, is specifically set forth in theAMLA.
““‘The duty of a hospital to use due care in the treatment, of its patients is an obligation created by law; and the breach of that duty is a failure to observe a reasonable standard of due care under the circumstances which gives rise to the tort action. There exists a duty implied by law, as opposed to a contract implied by law, to exercise due care, the breach of which gives rise to an action in tort. We again affirm those decisions which refuse to imply a contract in law to impose a duty upon a hospital to use due care in the treatment of its patients.” ’ ”
Marsh v. St. Margaret’s Hosp., 535 So.2d 147, 149 (Ala. 1988) (quoting Lemmond v. Sewell, 473 So.2d 1047, 1048-49 (Ala. 1985), quoting in turn Berry v. Druid City Hosp. Bd., 333 So.2d 796, 799 (Ala. 1976)). Thus, even though Bain has brought an action in tort, not in contract, the law does not impose an implied contractual duty on a hospital to exercise due care. Bain cites .no authority that would allow this Court to imply a contractual duty upon HKH to provide Heath with emergency physician services that fall within the applicable standard of care. Accordingly, Bain has failed to identify a specific duty upon HKH arising from a contract to provide its patients with emergency physician services that are within the applicable standard of care. General Fin. Corp. v. Smith, 505 So.2d at 1047.
Bain farther argues that “[p]ublic policy also justifies a nondelegable duty on hospitals for the conduct of their emergency room physicians.” Bain’s brief, at 59. This is so, she says, because “[a]ny other rule fosters the type of carelessness and flippancy that is evidenced in this case.” Id. First; this Court has repeatedly stated that public-policy arguments directed to this Court are directed to the wrong branch of State governnient. See Boles v. Parris, 952 So.2d 364, 367 (Ala. 2006) (“[I]t is well established that thé legislature, not this Court, has the exclusive domain to formulate public policy in Alabama.”). Further, the legislature has already set forth the applicable public policy in medical-malpractice cases in § 6-5-540, Ala. Code 1975, part of theAMLA:
“This Legislature finds and declares that the increasing threat of legal actions for alleged medical injury causes and contributes to an increase in .health care costs and places a heavy burden upon those who can least afford such .increases, and that..the threat of such actions contributes to expensive medical procedures to be performed by physicians and other health care providers which otherwise would not be considered necessary, and that the spiraling costs and decreasing availability of essential medical services caused by the threat of such litigation constitutes a danger to the health and safety of the citizens of this state, and that this article should be given effect immediately to help control *968 the spiraling cost of health care and to insure its continued availability.”
To recognize a nondelegable duty in this case solely on public-policy grounds would contravene the expressed public policy of this State 'to “control the spiraling cost of health care and to insure its continued availability.” Id. Generally speaking, this Court is ill equipped to make policy determinations—especially expansions in liability for highly regulated entities such as hospitals—that have far-reaching and potentially unforeseeable consequences.
Finally, as HKH and amicus curiae Alabama. Hospital Association point put, if Bain truly believed . that HKH acted wrongfully in allowing Dr. Wigfall to work in the hospital, then she could have brought a negligence action directly against HKH. See Humana Med. Corp. of Alabama v. Traffanstedt, 597 So.2d 667, 669 (Ala. 1992) (setting forth the “corporate liability” theory, which is based on a hospital’s “ ‘independent negligence in appointing to its medical staff a physician who is incompetent or otherwise unfit, or in failing to properly supervise its medical staff,’ ” which is distinct from a theory of vicarious liability because “typically, physicians on the staff of a hospital are considered independent contractors rather than., employees [and] vicarious liability does not 'attach to a hospital for the negligent acts of medical staff members” (quoting 8 Causes of Action 427, 431 (1985))).
In Baptist Memorial Hospital System v. Sampson, 969 S.W.2d 945, 949 (Tex. 1998), the Supreme Court of Texas rejected a Texas Court of Appeals’ decision to “create a nondelegable duty on a hospital solely because it opens its doors for business.” The court stated:
“[W]e reject the suggestion of the court of appeals quoted above that we disregard the traditional rules [of apparent authority] and take ‘the full leap’ of imposing a nondelegable duty on Texas hospitals for the malpractice of emergency room physicians. Imposing such a duty is not necessary to safeguard patients in hospital emergency rooms. A patient injured by a physician’s malpractice is not without a remedy. The injured patient ordinarily has a cause of action against the negligent physician, and may retain a direct cause of action against the hospital if the hospital was negligent in the performance of a duty owed directly to the patient.”
Id. (emphasis added).
We agree with the Texas Supreme Court insofar as it, at least implicitly, concluded that no injustice is done by failing to impose a nondelegable duty on a hospital for the negligence of an independent-contractor emergency-room physician. In the present case, Bain has asserted a medical-malpractice action against the alleged tortfeasor, Dr. Wigfall; there is no indication in the record that Dr. Wigfall did not have the proper malpractice insurance; and Bain could have, but did not, bring a negligence action directly against HKH for the negligent performance of á duty HKH owed directly to Heath.
For all the above reasons, Bain has failed to demonstrate that the trial court erred in entering a summary judgment in favor of HKH as to Bain’s claim that HKH was vicariously liable for the alleged malpractice of Dr. Wigfall based on a nondele-gable duty.
Conclusion
The trial court’s summary judgment in favor of HKH as to each claim brought against it by Bain is due to be affirmed.
AFFIRMED.
Stuart, Bolin, Shaw, Main, Wise, and Bryan, JJ., concur.
Parker and Murdock, JJ., concur in part and dissent in part.

. Bain amended her complaint in October 2014, and the amended complaint included claims against HKH; Coastal Emergency Services, Inc.; Avalon Medical Center, P.C.; Advanced Surgical Care, P.C.; Surgical Associates of the Shoals, P.C.; Shoals Surgical Group, LLC; Dr. Preston Wigfall; CHG Healthcare Services, Inc., d/b/a Weatherby Healthcare; CHG Administrative Management, Inc.; CHG Medical Staffing, Inc.; and Weatherby Locums, Inc.

. Dr. Wigfall described a "differential diagnosis” as "a list of clinical entities that may or may not be responsible for a patient’s complaints."

. Because the summary judgment is affirmed on the basis set forth above, we pretermit discussion of HKH’s two other bases for a summary judgment regarding Bain’s claims against its nurses, which were addressed by Bain on appeal: that there was no evidence of causation in light of Dr. Wigfall’s testimony that knowledge of Heath’s family history would have made no difference in his treatment of Heath and in light of Bain's expert's testimony that Dr. Wigfall should have ordered a chest CT, regardless of Heath’s family history.

. As HKH points out, Bain does not point to any evidence in the record indicating that either she or Heath was léd to believe that Dr. Wigfall was an HKH employee based on any specific statements found in the documents they signed while at the hospital,

. On appeal, Bain argues that the trial court erred in striking any part of the affidavit she filed in response to HKH’s motion for a summary judgment. For purposes of discussing Bain’s vicarious-liability argument; we have ■ assumed that she is correct in this regard and ' that no -part of her affidavit should have been stricken. '

. It is undisputed that Heath and Bain chose to go to the hospital because of its reputation for providing good emergency services, but Bain fails to point this Court to any evidence in the record indicating that she and Heath chose to go to the hospital because of HKH’s "pecuniary responsibility” to answer for the negligence of any physician who might treat Heath.

. Section 7-9-503 was repealed by Act No. 2001-481, Ala. Acts 2001, § 1, effective January I, 2002, and was replaced by § 7-9A-609, Ala. Code 1975.

. Apparently Because these federal regulations were issued for the specific purpose of “determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid,” 42 C.F.R. § 482.1, Congress has explicitly rejected any notion that those regulations establish a duty of care to a patient in a medical-malpractice action:. "[T]he devel-ópment, recognition, or implementation of any guideline or other standard under any Federal health care provisión shall not be construed to establish the standard of care or duty of care owed by a health care provider to a patient in any medical malpractice ... action or claim.” 42 U.S.C. § 18122(1).